

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-26-1997

# Kachmar v. SunGard Data Sys Inc

Precedential or Non-Precedential:

Docket 96-1119

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Kachmar v. SunGard Data Sys Inc" (1997). *1997 Decisions.* Paper 71.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/71

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 96-1119

LILLIAN KACHMAR,

Appellant
v.

SUNGARD DATA SYSTEMS, INC.;
LAWRENCE A. GROSS; DONNA J. PEDRICK

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 95-cv-01282)

Argued September 10, 1996

Before: SLOVITER, Chief Judge,
COWEN and LEWIS, Circuit Judges

(Filed March 26, 1997)

Lek Domni   (Argued)
Philadelphia, PA  19102

        Attorney for Appellant

Jami Wintz McKeon   (Argued)
Julie A. Uebler
Of Counsel:
  Morgan, Lewis & Bockius LLP
Philadelphia, PA  19103

        Attorneys for Appellees

OPINION OF THE COURT

SLOVITER, <u>Chief Judge</u>.


Lillian Kachmar, who held the position of senior in-house counsel for defendant SunGard Data Systems, Inc. before her employment was terminated, filed this action arising out of that termination.  She raised a claim of retaliatory discharge in violation of Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000(e), <u>et seq.</u>, as well as a claim of sex discrimination under that statute, and included a pendent state law claim of tortious interference with prospective contractual relations.  We address for the first time the application of Title VII to a plaintiff who formerly occupied an in-house counsel position.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

To the extent that this appeal comes to us after the district court granted defendants' motion to dismiss the Title VII retaliation claim and the state law claim, the factual record is necessarily limited and we must decide the appeal primarily on the basis of the allegations of the plaintiff's complaint.

Appellee SunGard Data Systems, Inc. is a computer services company that specializes in proprietary investment support systems and computer disaster recovery.  On April 2, 1991, Kachmar, a 1978 Villanova Law School graduate, was hired to provide legal services for the parent company and its five subsidiaries.  Her immediate supervisor was defendant Lawrence Gross, SunGard's General Counsel.  Defendant Donna Pedrick was

corporate Vice President of Human Resources.  On December 31, 1991, after nine months with the company, Kachmar received her first and only written performance appraisal from Gross.  In that review, Gross gave her a favorable overall rating and stated that she was a valuable addition to the legal department.  In fact, Kachmar exceeded her set goals for billable hours each year she was employed by SunGard, which entitled her to receive incentive bonuses.  She was also given annual merit increases to her base salary every year she was employed.

Kachmar's employment with SunGard was uneventful until the Fall of 1992, when a series of events took place that brought her into conflict with SunGard senior management and with Gross in particular.  The first incident concerned a disagreement over the salary level of a new attorney at SunGard, Sarah Armstrong, whom Kachmar had helped recruit as the third lawyer in the in-house counsel's office.  Kachmar alleges that she was misled by Gross concerning the available salary for Armstrong and that she discussed with Pedrick raising Armstrong's salary to a level commensurate with Armstrong's qualifications.  At that time, Kachmar further complained to Pedrick that she herself was being under-compensated according to SunGard's internal practices and procedures.

The second incident arose when Kachmar, who was asked for her opinion, advised SunGard to give a bonus to one of the female sales representatives of SunGard Recovery, one of the

subsidiaries, over the opposition of the employee's male managers. She alleges that because of her advice she was labeled a "feminist" and a "campaigner for women's rights," terms meant to be derogatory. App. at 15.

In the course of her work, Kachmar observed that SunGard Recovery had "no real representation of females in upper management," App. at 15, and she advised Pedrick and Gross that this situation could render the company ineligible for certain federal contracts. Both declined to talk to the president of the subsidiary, Ken Adams, but suggested Kachmar could do so. Kachmar did, and alleges that Adams then had a "stormy interchange with Pedrick and Gross demanding to know why he had not received EEO advice from them earlier." Id. SunGard Recovery subsequently added women to its upper management.

The final incident occurred when SunGard Recovery sought to fire an African-American Senior Vice President, and Kachmar tried to advise the new president of SunGard Recovery, Michael Mulholland, regarding the EEO implications of the firing. She alleges she was told that the company "should just pay [the individual] off." Id. at 16.

On January 15, 1993, Kachmar met with Gross to receive her annual review. He told her that she was not on "the management track" because of her "conduct." Id. at 17. Gross did not criticize her competence as Senior Counsel, but instead engaged in a diatribe against her for "campaigning on women's

issues," referring to her complaints about her own and Armstrong's levels of compensation, and for "feminist campaigning" in her handling of the matter of the female employee of SunGard Recovery. Id. at 17-18. Following this meeting, Gross began to ignore Kachmar and interacted with her as little as possible except in formal settings, despite Kachmar's attempts to "clear the air." Id. at 18.

Kachmar continued in her position as Senior Counsel after her meeting with Gross, though their relationship was strained. In mid-1993, Kachmar further advised the president of the Recovery Group that the Vice President, William Baumont, should be counseled regarding his treatment of women because there had been complaints about his conduct, but her advice was received with hostility.

In October, 1993, Kachmar sought advice from Pedrick concerning her relationship with Gross, and Pedrick advised Kachmar to begin looking for a job elsewhere. Kachmar alleges that although she was still employed, Gross offered her job to a male attorney in November, 1993, who declined the offer. About two months later, on January 5, 1994, Kachmar was notified of her termination for alleged performance problems. She contends that the manner of her dismissal contravened company policy and procedure, which required written notice and an opportunity to cure the alleged deficiencies. Although Sarah Armstrong was

promoted to the position of Senior Counsel, Kachmar contends that in fact she was replaced by a male attorney, Michael Zuckerman.

Following her termination, Kachmar sought employment with a Philadelphia law firm. Kachmar asserts that Armstrong intentionally sabotaged Kachmar's efforts to obtain employment by telling a member of the firm that Kachmar was planning to sue SunGard.

After exhausting her administrative remedies, Kachmar filed a complaint alleging that SunGard, Gross, and Pedrick (hereafter collectively referred to as SunGard) illegally terminated her in retaliation for her exercise of protected rights under Title VII, and that SunGard engaged in a pattern and practice of sex discrimination. She also included a Pennsylvania common law claim for tortious interference with prospective contractual relations. Defendants filed a motion to dismiss and/or for partial summary judgment. The district court granted the motion to dismiss the Title VII retaliation and state law tort counts and granted summary judgment to defendants on the remaining Title VII claim of sex discrimination. Our review is plenary.

## II.

## DISCUSSION

### A. Retaliatory Discharge

**1. Causal Link**

The pertinent provision of Title VII states that: "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a) (1993). In her retaliation claim, Kachmar contends that she was discharged because she voiced her opposition to SunGard's unlawful employment practices regarding both herself and others.

In order to establish a prima facie case of discriminatory retaliation under Title VII, Kachmar must show 1) that she engaged in protected activity, 2) that the employer took adverse action against her, and 3) that a causal link exists between the protected activity and the employer's adverse action. Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 201 (3d Cir.), cert. denied, 115 S.Ct. 590 (1994); Jalil v. Avdel Corp., 873 F.2d. 701, 708 (3d Cir. 1989), cert. denied, 493 U.S. 1023, 110 S.Ct. 725 (1990).

The district court held that Kachmar's complaint adequately pled the first two elements of such a claim but that her complaint did not satisfy the third. The court held that, as a matter of law, Kachmar could not prove the requisite causation,

noting that the termination of her employment occurred almost a year after the alleged protected activity took place.

Cases in which the required causal link has been at issue have often focused on the temporal proximity between the employee's protected activity and the adverse employment action, because this is an obvious method by which a plaintiff can proffer circumstantial evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse action."  Zanders v. National R.R. Passenger Corp., 898 F.2d 1127, 1135 (6th Cir. 1990); see Jalil, 873 F.2d at 708.  We have stated, however, that where there is a lack of temporal proximity, circumstantial evidence of a "pattern of antagonism" following the protected conduct can also give rise to the inference. Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993).  These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference.  See, e.g., Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986).

The district court here analyzed the circumstantial evidence -- the gap in time between Kachmar's protected activities and her termination -- and determined it lacked the requisite proximity.  It then proceeded to assess whether there was a pattern of antagonism that could allow a fact-finder to infer retaliatory animus.  It found no such pattern.

In dismissing on the ground that the facts pled in Kachmar's complaint, even if proven, would be insufficient to show the required causal link, the district court took too narrow a view of the temporal proximity needed to satisfy the causal link element at this early stage of the case. It failed to accept the facts alleged in the complaint as true and construe those facts in the light most favorable to the plaintiff. See Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990).

The district court set the date of Kachmar's last protected activity in the Fall of 1992, when her discussions with SunGard management concerning the EEO implications of their personnel policies began. This failed to take into account the activities that Kachmar alleged occurred in mid-1993, when she further attempted to counsel SunGard of the EEO implications of management's treatment of women. If the mid-1993 date for the protected activity were used, there would be at most a gap of six months until Kachmar's official termination on January 5, 1994, rather than the gap of more than a year that the district court found.

Moreover, Kachmar claims she was advised by Pedrick to start looking for another job in October, 1993, only several months after her last protected activity. Her allegation that she was told her position had been offered to a male in November, 1993, shortly after her meeting with Pedrick, would, if proven,

show that Sungard had resolved to discharge her shortly after the latest activity. Indeed, Gross' statements to Kachmar as early as January 15, 1993 that she was being taken off the "management track," which she claims was a reaction to her protected activity, would further support her claim that it was her protected activity that placed her in disfavor, ultimately leading to her termination.

SunGard asserts that even a four month gap would be too long to allow an inference of causation. Our cases set no parameters but were decided in the context of the particular circumstances before us. See, e.g., Robinson, 982 F.2d at 894-95 (expressing doubt that discharge could be causally linked to an employee's protected activity taken almost two years previously, absent the intervening pattern of antagonism); Jalil, 873 F.2d at 708 (holding that interval of two days between employee's EEOC complaint and discharge of plaintiff sufficient to create an inference of causation).

It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was

not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.

SunGard may have recognized that termination of Kachmar immediately after her January 15, 1993 meeting with Gross could have resulted in disruption of the small, three-attorney in-house counsel's office. After all, Kachmar was senior in-house counsel, not one of many interchangeable employees on an assembly line. We do not know whether she was involved in long-term negotiations or litigation that could have deterred Sungard from terminating her immediately.

By summarily concluding that there was too great a gap between Kachmar's protected acts and her termination, the district court failed to give Kachmar the opportunity to delve further into the facts by discovery. SunGard relied on appellate court cases holding that the time between the protected activity and the alleged retaliation was insufficient to raise the inference of causation. These cases arose following a greater opportunity for factual exploration than Kachmar was given here, where the court dismissed on the basis of the complaint alone. See, e.g., Hughes v. Derwinski, 967 F.2d 1168, 1174 (7th Cir. 1992) (granting summary judgment because disciplinary letter issued four months after discrimination charge filed insufficient causal link to employer action); Cooper v. City of North Olmstead, 795 F.2d 1265, 1272 (6th Cir. 1986) (reversing after a bench trial and holding that discharge four months after filing

of discrimination charge not causally linked to adverse employment action).

We need not consider the district court's secondary determination that there was no "pattern of antagonism" that would give rise to an inference of improper motive because Kachmar alleged enough direct evidence of a retaliatory animus on the part of Gross independent of her contention that their relationship became strained after their January 1993 meeting.

Kachmar alleges that at the January 15, 1993 review, Gross told her that she was not on the management track because of her complaints concerning her salary, her "campaigning on women's issues," and her handling of the female employee matter, which Gross cited as an additional example of feminist campaigning. These statements, if proven, would present direct evidence of Gross' retaliatory motives because they would permit a factfinder to infer that Kachmar was being taken off the management track because of her opposition to the manner in which SunGard was treating her and other women in the organization, and that her final dismissal was just a matter of time. Such statements could be interpreted to show that Gross placed "substantial negative reliance on an illegitimate criterion in reaching [his] decision" that Kachmar had little future with SunGard. Starceski v. Westinghouse Electric Corp., 54 F.3d 1089, 1096 (3d Cir. 1995). In concentrating exclusively on the gap between Kachmar's protected activity and her firing, and the

sufficiency of Kachmar's allegations of a pattern of antagonism, the district court failed to make the more generalized inquiry into whether Kachmar's protected activity was the likely reason for her termination. See Waddell, 799 F.2d at 73; cf. Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."). Whether Kachmar's protests regarding what she believed was the company's Title VII vulnerability were the likely cause of her termination is a difficult factual question. Because the facts viewed in the light most favorable to Kachmar would support an inference of retaliation, her complaint states a colorable claim as to which she is entitled to further factual development.

**2. Claim by In-house Counsel**

SunGard argues that we should affirm the dismissal on the alternative basis that maintenance of Kachmar's retaliatory discharge action would improperly implicate communications subject to the attorney-client privilege and/or information relating to Kachmar's representation of Sungard. This court has not yet addressed the question of the viability of claims by in-house counsel under Title VII. The district court alluded to the issue but did not dismiss on that ground.

Those few federal courts that have been presented with discrimination actions brought by in-house counsel have generally held that once an attorney's employment has terminated, s/he is not barred from bringing suit against the former employer for retaliatory discharge under Title VII.  See, e.g., Jones v. Flagship Int'l., 793 F.2d 714, 726 (5th Cir. 1986), cert. denied, 479 U.S. 1065, 107 S.Ct. 952 (1987); Verney v. Pennsylvania Turnpike Comm'n, 903 F.Supp. 826, 832 (M.D. Pa. 1995); Hoskins v. Droke, No. 94-C-5004, 1995 WL 318817, at *2 (N.D.Ill. 1995); Kocher v. Acer, No. C-93-20132RMW, 1993 WL 149077 at *3 - *4 (N.D. Cal. 1993); Golightly-Howell v. Oil, Chemical & Atomic Workers Int'l Union, 806 F.Supp. 921, 925 (D. Colo. 1992); see also Breckinridge v. Bristol-Myers Co., 624 F.Supp. 79, 83 (S.D. Ind. 1985) (charging discrimination under the ADEA).  In the only federal appeals court case brought to our attention, the court stated, "In assuming her position as [in-house attorney, plaintiff] neither abandoned her right to be free from discriminatory practices nor excluded herself from the protections of [Title VII]."  Jones, 793 F.2d at 726.

Title VII defines the "employee" who can bring suit in broad terms.  See 42 U.S.C. § 2000e(f) (1994).  Although that same section contains discrete exclusions, such as exempting persons elected to public office, their personal staff, and policy-making appointees, Congress did not exclude in-house attorneys.

SunGard concedes that in-house counsel are not _per se_ precluded from bringing a retaliatory discharge claim but argues that such suits are limited to cases in which confidential information is not implicated, which it contends is not the case here.  It argues that by pursuing this claim Kachmar would be violating her ethical duties under the Pennsylvania Rules of Professional Conduct which impose a general duty of confidentiality with respect to "information relating to the representation of a client."  _See_ Pennsylvania Rules of Professional Conduct 1.6 (1996).  SunGard notes that while Rule 1.6(c)(3) allows the disclosure of confidential information "to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client," the comments to the Rule only offer two examples of such disputes: where there is a dispute over fees and where an attorney is defending against a claim implicating his conduct.  _See_ _id._  However, the Rules do not address affirmative claims for relief under a federal statute and thus we believe they are at best inconclusive on the issue SunGard raises.

SunGard seeks to bolster its contention that suits such as this by former in-house counsel run counter to the policies underlying the attorney-client privilege by citing a few state Supreme Court cases.  It is true that some state cases take a restrictive view of the former in-house counsel's ability to file suit for retaliatory discharge.  The most restrictive approach

appears to have been taken in <u>Balla v. Gambro, Inc.</u>, 584 N.E.2d 104, 145 Ill.2d 492 (1991), which held that tort actions for wrongful discharge are unavailable to in-house counsel. <u>See</u> <u>also</u> <u>Herbster v. North American Co.</u>, 501 N.E. 2d 343 (Ill. App. Ct. 1986).

Although the California Supreme Court, which considered the issue in <u>General Dynamics Corp. v. Superior Court</u>, 876 P.2d 487, 490-91, 7 Cal.4th 1164, 1170-71 (1994) (en banc), has not adopted Illinois' blanket preclusion, SunGard relies on language in that opinion limiting the availability of suits by in-house counsel. In that case, a former in-house counsel filed a contract and tort action alleging that he was terminated in part because he had spearheaded an investigation into employee drug use at a company plant and had advised General Dynamics that its salary policy may have been in violation of the Fair Labor Standards Act. In a thoughtful opinion, the Court declined to dismiss the action at the pleadings stage, holding that "under circumscribed conditions, an in-house attorney may pursue a wrongful discharge claim for damages against his corporate employer even though a judgment ordering his reinstatement is not an available remedy." <u>Id.</u> at 495. The Court viewed the situation of in-house counsel as being more analogous to that of corporate executives who "owe their livelihoods, career goals and satisfaction to a single organizational employer," than to that of an attorney in the traditional attorney-client relationship,

noting, "[u]nlike the law firm partner, who typically possesses a significant measure of economic independence and professional distance derived from a multiple client base, the economic fate of in-house attorneys is tied directly to a single employer, at whose sufferance they serve."  Id. at 491.

The Court further observed that the professional relationship between the in-house attorney and the client did not fit the standard model of the "one-shot" undertaking – drafting a will or handling a piece of litigation – characteristic of the outside law firm.  The corporate attorney-employee, the Court stated, "operating in a heavily regulated medium, often takes on a larger advisory and compliance role, anticipating potential legal problems, advising on possible solutions and generally assisting the corporation in achieving its business aims . . . ."  Id.[1]

The language on which SunGard relies arose when the Court considered the possible limitations on the vitality of wrongful discharge claims when brought by former in-house

---

[1]  For an account of the rise of the corporate legal department and its implications for the traditional "outside" law firm, see Abram Chayes & Antonia H. Chayes, Corporate Counsel and the Elite Law Firm, 37 Stan. L. Rev. 277 (1984).  A number of scholarly articles have addressed the dynamics of lawyer-client relations in the organizational context.  See, e.g., Sara A. Corello, Note, In-House Counsel's Right to Sue for Retaliatory Discharge, 92 Colum. L. Rev. 389 (1992); Stephen E. Kalish, The Attorney's Role in the Private Organization, 59 Neb. L. Rev. 1 (1988); Kenneth J. Wilbur, Wrongful Discharge of Attorneys: A Cause of Action to Further Professional Responsibility, 92 Dick. L. Rev. 777 (1988); Daniel S. Reynolds, Wrongful Discharge of Employed Counsel, 1 Geo. J. Legal Ethics 553 (1988).

counsel.  The Court, after holding that a limited remedy should be provided for former in-house counsel "confronted with the dilemma of choosing between adhering to professional ethical norms and surrendering to the employer's unethical demands," recognized the need to accommodate the "values that underlie the professional relationship – the fiduciary qualities of mutual trust and confidence."  Id. at 502, 503.  It was in that context that the Court stated that "in those instances where the attorney-employee's retaliatory discharge claim is incapable of complete resolution without breaching the attorney-client privilege, [a wrongful discharge] suit may not proceed," unless "some statute or ethical rule, such as the statutory exceptions to the attorney-client privilege . . . specifically permits the attorney to depart from the usual requirement of confidentiality."  Id. at 490, 502.  The Court noted that there are ample possibilities for preserving confidential communications, and underlined the fact that dismissal at the demurrer stage will seldom, if ever, be appropriate.  See id. at 489.

Other state courts have also permitted former in-house attorneys to bring wrongful discharge actions in tort, similarly analyzing the state public policies at issue.  See, e.g., GTE Products Corp. v. Stewart, 653 N.E.2d 161, 166-68, 421 Mass. 22, 28-29 (1995) (holding that in-house counsel may maintain wrongful discharge action where fired for refusing to violate ethical

norms); Parker v. M & T Chemicals, Inc., 566 A.2d 215, 220, 236 N.J.Super. 451, 459 (1989) (holding that employee-attorney may bring a damage suit for wrongful discharge under New Jersey's Conscientious Employee Protection Act, as public policy in favor of whistle-blowing on illegal conduct overrides attorney's duties of confidentiality).

The federal courts that have addressed the question have cited the important public policies underlying federal anti-discrimination legislation and the supremacy of federal laws in determining that federal anti-discrimination statutes take precedence over the at-will discharge principle. See, e.g., Jones, 793 F.2d at 726; Stinneford v. Spiegel Inc., 845 F.Supp. 1243, 1245-46 (N.D. Ill. 1994); Rand v. CF Industries, Inc., 797 F.Supp. 643, 645 (N.D. Ill. 1992).

The Jones court, although ultimately upholding the district court decision that the employer was justified in terminating the former attorney-manager of its EEO programs, emphasized that the provisions of Title VII must be construed broadly to extend to all employees and must be rigorously enforced: "since the enforcement of Title VII rights necessarily depends on the ability of individuals to present their grievances without the threat of retaliatory conduct by their employers, rigid enforcement of § 704(a) [the retaliatory discharge provision] is required." Jones, 793 F.2d at 726; see also Stinneford, 845 F.Supp. at 1246 ("[T]he Supremacy clause demands

that the federally mandated protections of the ADEA triumph over the state principle of at-will employment.").  Such an approach is consistent with the policy to liberally construe the discrimination laws to best effectuate their remedial purpose. See County of Washington v. Gunther, 452 U.S. 161, 170 (1981).

We do not suggest that concerns about the disclosure of client confidences in suits by in-house counsel are unfounded, but these concerns alone would not warrant dismissing a plaintiff's case, especially where there are other means to prevent unwarranted disclosure of confidential information.  In Breckinridge v. Bristol-Myers Co., 624 F.Supp. 79 (S.D. Ind. 1985), where the defendants' legal officer claimed that the reasons offered by the company for his dismissal were a pretext for illegal age discrimination, the district court determined that while certain breaches of confidential material were problematic, "what [the plaintiff] Breckinridge did as the defendants' employee is assuredly relevant and pivotal in this case." Id. at 84.  It did not disallow the plaintiff from providing testimony as to his duties and actions as general counsel, and, in fact, explicitly noted that information relating to the plaintiff's activities was relevant and discoverable.  See id. at 83.

It is premature at this stage of the litigation to determine the range of the evidence Kachmar will offer and whether or how it will implicate the attorney-client privilege.

For example, without deciding the substance of the issue, it is difficult to see how statements made to Kachmar and other evidence offered in relation to her own employment and her own prospects in the company would implicate the attorney-client privilege.  See, e.g., Breckenridge, 624 F. Supp. at 82.  It is also questionable whether information that was generally observable by Kachmar as an employee of the company, such as her observations concerning the lack of women in a SunGard subsidiary, would implicate the privilege.  Moreover, there may be a fine but relevant line to draw between the fact that Kachmar took positions on certain legal issues involving SunGard policies, and the substance of her legal opinions.  See General Dynamics, 876 P.2d at 491 (discussing fact that plaintiff counsel advised the company that it was in possible violation of the Fair Labor Standards Act).

In Doe v. A Corp., 709 F.2d 1043, 1050 (5th Cir. 1983), the court observed that "[a] lawyer . . . does not forfeit his rights simply because to prove them he must utilize confidential information.  Nor does the client gain the right to cheat the lawyer by imparting confidences to him."  Id. at 1050; cf. Oregon State Bar Legal Ethics Comm., Formal Op. 1994-136 (stating that attorney may disclose confidences to establish a wrongful termination claim where attorney was terminated after refusing to make false representations on a patent application).

In balancing the needed protection of sensitive information with the in-house counsel's right to maintain the suit, the district court may use a number of equitable measures at its disposal "designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege." General Dynamics, 876 P.2d at 504. Among those referred to in General Dynamics were "[t]he use of sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings." Id. Admittedly, this may entail more attention by a judicial officer than in most other Title VII actions, but we are not prepared to say that the trial court, after assessing the sensitivity of the information offered at trial, would not be able to draft a procedure that permits vindicating Kachmar's rights while preserving the core values underlying the attorney-client relationship. It follows that we cannot affirm the dismissal of Kachmar's retaliatory discharge claim at this preliminary stage on the alternative grounds suggested by SunGard.

## B. Sex Discrimination

In contrast to the dismissal of Kachmar's retaliatory discharge claim, the district court entered summary judgment for SunGard on Kachmar's sex discrimination claim. In her complaint Kachmar alleged that SunGard engaged in a "pattern and practice

of discrimination against females, including plaintiff, in rates of compensation, promotions, hiring, retention, and discharge." App. at 21. Kachmar sought damages and reinstatement with back-pay. The parties have therefore treated this as a claim under Title VII that Kachmar was fired on account of her sex that is independent of her Title VII retaliatory discharge action.

To establish a prima facie case of employment discrimination, a plaintiff must show that she is a member of a protected class, that she was qualified for the position under dispute, that she was dismissed from that position, and that she was replaced by a member of a favored class. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824 (1973); Lazarz v. Brush Wellman, Inc., 857 F.Supp. 417, 422 (E.D. Pa. 1994). The first three elements of Kachmar's prima facie case are undisputed. The district court granted SunGard's motion for summary judgment based on the fourth element, holding that there was no dispute as to the fact that Kachmar was replaced by a female employee.

The district court's treatment of this issue was brief. The court stated:

Defendants have submitted an affidavit of Defendant Gross which indicates that Kachmar was replaced by Armstrong, another female. In response, Kachmar has filed her own affidavit stating that she "trained Sarah Armstrong and worked with her, [she knew] her experience [was] not comparable to [her] own . . . [s]he may have been given my title, but she did not and could not replace me." See Affidavit of Kachmar, at ¶ 15. This is not sufficient to

stave off summary judgment.  Since I find that there is no genuine issue as to who replaced Kachmar, Defendants' Motion for Partial Summary Judgment will be granted.

App. at 60-61.

Had the relevant issue been who was given Kachmar's title, Gross's affidavit would have been dispositive, as Kachmar did not dispute that Sarah Armstrong, another woman, was promoted into her position of Senior Counsel.  She did, however, dispute that Armstrong "replace[d]" her.  She contends that while Armstrong took over Kachmar's position in name, Michael Zuckerman, who was hired as Corporate Counsel to fill Armstrong's place, was Kachmar's actual replacement.  She asserts that the timing of the hiring and the relative experience of Armstrong and Zuckerman strongly suggest that Armstrong became Senior Counsel in name only.

As this issue arises on summary judgment, Kachmar's failure to provide some evidence other than her own belief that Zuckerman rather than Armstrong replaced her would require affirmance under ordinary circumstances.  For example, she has failed to overcome the memorandum SunGard produced dated March 18, 1994, from Gross to 53 SunGard management employees that states:

I am pleased to announce that Sara Armstrong has been promoted to the position of Senior Counsel.  In just two years with the Company, Sara has quickly learned many of the intricacies of our myriad businesses and assumed major responsibilities in the areas of customer contracts and acquisitions.  By way of reminder, Sara previously worked on the

mergers and acquisitions team at the
Philadelphia law firm of Dechert Price &
Rhoads; she is a 1988 graduate of Columbia
Law School and also holds a masters degree
from the Kennedy School of Government and a
bachelors degree from the University of
Pennsylvania.

I am also pleased to announce that Mike Zuckerman will
be joining the Company as Corporate Counsel
in mid-April.  Before attending Harvard Law
School, where he graduated *cum laude* in 1990,
Mike worked for ten years in the computer
industry, including positions as Manager of
Product Development and Director of Technical
Services for a provider of specialty turnkey
systems.  Since 1990, Mike has applied his
unique blend of legal and computer skills at
Dechert, Price & Rhoads, where he has handled
a variety of computer law, intellectual
property and general corporate assignments.
Mike will be handling similar types of
assignments for SunGard.

App. at 34.  As this memorandum appears to notify those who would

be likely to refer matters to in-house counsel of the respective

positions occupied by Armstrong and Zuckerman, it supports

SunGard's position that Armstrong replaced Kachmar.  Kachmar

notes that SunGard "waited seven weeks . . . to announce

Armstrong's promotion to Senior Counsel" and argues that she

should be able to explore by discovery whether it is a "possible

pretext."  Appellant's brief at 39.

It appears from this limited record that Kachmar will

have a difficult road to travel to support her allegation that

Armstrong's promotion was simply a ruse.  However, Kachmar was

not given the opportunity to test her contention by discovery.

Although she followed the procedure contained in Rule 56(f) by

certifying her need to have the opportunity to complete discovery before the court made a dispositive ruling on SunGard's motion for summary judgment, see App. at 47, the district court entered judgment without giving her that opportunity.  Nor did the district court explain why it was denying the request for discovery.  Inasmuch as Kachmar has had no opportunity for discovery, we will vacate the order granting summary judgment to give her the chance to pursue this theory.

In remanding on this issue, we do not suggest that "replacement" for purposes of Title VII means that every detail of the duties which Kachmar performed need be compared to those performed by Armstrong and Zuckerman.  It would be only natural that duties shift with new personnel, as they bring to the position varied skills and expertise that may differ from those of the prior occupant.  Nor is salary necessarily determinative.  The relevant issue is whether the title of Senior Counsel given to Armstrong was merely a ruse to conceal replacing Kachmar with Zuckerman, a male.  Because this is a narrow issue, the district court may limit discovery on this claim accordingly.

## C. Individual Liability

The district court dismissed Gross and Pedrick as defendants in both the retaliatory discharge and discrimination claims on the ground that individuals may not be held liable under Title VII.

In Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996), this court in an en banc decision, joined the majority of other circuits in concluding "that Congress did not intend to hold individual employees liable under Title VII."  Id. at 1077; see also Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996).  We will therefore affirm the district court's order dismissing Kachmar's Title VII claims against Pedrick and Gross.

### D. Tortious Interference with Prospective Contractual Relations

Kachmar appended to her Title VII claims a state law claim of tortious interference with prospective contractual relations.  She alleges that after SunGard discharged her, Armstrong telephoned one of the partners of the law firm with which Kachmar was seeking employment "on the pretext of getting a message to [Kachmar] on an unrelated matter" and "[w]hile engaged in this conversation, and for no reason except to attempt to interfere with [Kachmar's] efforts to find new employment, Armstrong advised the partner that [Kachmar] had hired counsel and was going to sue SunGard."  Complaint at ¶¶ 68, 69.  As a result, discussions between the law firm and Kachmar were discontinued.[2]

[2]   Kachmar argues for the first time in her reply brief that her claim that Armstrong's telephone call constituted discriminatory retaliation was never dismissed by the district court.  We need not decide whether the Supreme Court's recent holding that former employees may bring suits for discriminatory retaliation under Title VII, see Robinson v. Shell Oil Co., 117 S.Ct. 843 (1997); see also Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 200 (3d

To prevail on a claim of intentional interference with prospective contractual relations under Pennsylvania law, Kachmar must show the following: (1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct.  Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 208, 412 A.2d 466, 471 (1979); Advent Systems Ltd. v. Unisys Corp., 925 F.2d 670, 673 (3d Cir. 1991) (citing Silver v. Mendel, 894 F.2d 598, 601–602 (3d Cir.), cert. denied, 496 U.S. 926 (1990)).

The district court held that Kachmar stated sufficient facts to meet the second and fourth prongs of the cause of action, but that the allegations of the complaint that Kachmar merely "sought" an attorney position with a prominent law firm in Philadelphia did not rise to the level of a "prospective contractual relation" as it was too indefinite.  The district court also held that Kachmar could not prove an absence of privilege because Armstrong's statement was truthful, citing the Restatement (Second) of Torts § 772 (1979).  It thus dismissed Kachmar's complaint for failure to state a claim upon which relief can be granted.

(..continued)
Cir.), cert. denied, 115 S.Ct. 590 (1994), covers these facts because Kachmar failed to raise this issue in her initial brief and it is therefore waived.  See McLendon v. Continental Can Co., 908 F.2d 1171, 1183 (3d Cir. 1990).

A "prospective contractual relation" is, by definition, not as susceptible of precise, exacting identification as is an existing contract. "[A]nything that is prospective in nature is necessarily uncertain." Glenn v. Point Park College, 441 Pa. 474, 480, 272 A.2d 895, 898 (1971). We have previously held that the Pennsylvania Supreme Court requires that there be an objectively reasonable probability that a contract will come into existence, Schulman v. J.P. Morgan Inv. Management, Inc., 35 F.3d 799, 808 (3d Cir. 1994), something more than a "mere hope," Thompson Coal, 412 A.2d at 471.

We assume that had Kachmar's discussions led to a more definite employment prospect with the law firm, she would have so alleged and thus we share some of the district court's skepticism about the application of this tort to these facts. However, once again our disposition is governed by the procedural stage at which the issue arises. Kachmar's allegation that she learned during her discussions with the firm of Armstrong's conduct in informing the firm that Kachmar "hired a lawyer and was filing a discrimination suit against defendants," App. at 44, may suggest that the interaction between Kachmar and the firm passed beyond the preliminary stage. Of course, there is a wide gap between preliminary discussions and the "reasonable likelihood or probability" stage required by Pennsylvania law. Had the matter proceeded beyond dismissal to summary judgment, Kachmar would have been required to produce evidence from sources available to

her as to whether her contacts had reached that stage.  Dismissal on the basis of the complaint precluded that inquiry.

The other ground on which the district court dismissed was Kachmar's failure to show the absence of justification or privilege for Armstrong's action.  The court cited section 772 of the Restatement (Second) of Torts (1979) dealing with Advice as Proper or Improper Interference, which states:

> One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third-person
> (a) truthful information, or
> (b) honest advice within the scope of a request for advice.

(emphasis added).

The Pennsylvania Supreme Court has never explicitly adopted section 772, and we have therefore analyzed the element of justification or privilege using the language employed by the Pennsylvania cases.  Those cases have not stated that the truth of a statement in itself will defeat the tort claim but instead have focused on the broader issue of what constitutes a justified or privileged interference with prospective contractual relations.  In Silver v. Mendel, 894 F.2d 598, 603 n.7 (3d Cir.), cert. denied, 496 U.S. 926 (1990), we relied on the Pennsylvania Supreme Court's discussion in Glenn v. Park Point College, 441 Pa. at 479-80, 272 A.2d at 898, for the proposition that the absence of privilege or justification is "closely related to

. . . intent" and "is not susceptible of precise definition."  In

Advent Systems, we stated that,
When a defendant acts at least in part to protect some legitimate concern that conflicts with an interest of the plaintiff, a line must be drawn and the interests evaluated.  The central inquiry in the evaluation is whether the interference is 'sanctioned' by 'the rules of the game' which society had adopted [defining] socially acceptable conduct which the law regards as privileged.

925 F.2d at 673 (quoting Glenn, 272 A.2d at 899).

In a more recent case, the Pennsylvania Superior Court stated: "[T]he Pennsylvania Supreme Court has determined that the relevant inquiry must focus on the propriety of a defendant's conduct considering the factual scenario as a whole."  Ruffing v. 84 Lumber Co., 410 Pa.Super. 459, 467-68, 600 A.2d 545, 549 (1991) (emphasis in original); see also University Graphics, Inc. v. Pro-Image Corp., 913 F.Supp. 338, 346 (M.D. Pa. 1996). Because the district court focused solely on Restatement section 772 which gives dispositive effect to the truthfulness of the statement and failed to apply the broader Pennsylvania standard which looks to the propriety of the conduct, we will remand to the district court.

We do not suggest that the truthfulness of the statement is not a factor to be considered although we note that truthfulness is not referred to in either section 767 of Restatement (Second) of Torts, which provides a list of factors relevant to "proper" conduct, or in the Pennsylvania cases

dealing with interference with prospective contractual relations. The district court will have the opportunity to review in the first instance what may be the somewhat differing approaches to "proper" conduct in the Pennsylvania Superior Court. Compare Yaindl v. Ingersoll-Rand Co., 281 Pa.Super. 560, 573-74, 580 n.11, 422 A.2d 611, 618, 622 n.11 (1980) (employing the factors of section 767 and stating that the absence of privilege or justification is merely another way of stating that the defendant's conduct must be improper) with Vintage Homes, Inc. v. Levin, 382 Pa.Super. 146, 155, 554 A.2d 989, 994 (1989) (analyzing the tort only with reference to "absence of justification or privilege"), Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc., 340 Pa.Super. 253, 263, 489 A.2d 1364, 1370 (1985), and Ruffing, 600 A.2d at 549 (analyzing tort with reference to both the factors set forth in section 767 and "absence of justification or privilege").

Kachmar is entitled the opportunity to further develop her tortious inteference claim. Of course, to prosecute her claim against SunGard she has the burden of offering some evidence that Armstrong was acting within the scope of her employment when she contacted the law firm. See Yaindl, 422 A.2d at 625. We assume that whether Kachmar has any basis for asserting this claim against SunGard can be developed at the initial stages of discovery. We will therefore vacate the dismissal of this claim and remand for further proceedings.

## III.

## CONCLUSION

To summarize, the district court was premature in dismissing Kachmar's complaint in its entirety. First, we conclude that Kachmar has stated a prima facie case of retaliatory discharge under Title VII, and is not barred from pursuing her action by the attorney-client privilege and/or the ethical constraints of attorney-client confidentiality. Second, we hold that a genuine issue of material fact exists as to Kachmar's sex discrimination claim and summary judgment was therefore inappropriate. Third, we conclude that Kachmar has stated a claim for tortious interference with prospective contractual relations. Finally, we uphold the dismissals of the individual defendants Gross and Pedrick. Accordingly, we will affirm in part and vacate and remand the remainder of the order for further proceedings consistent with this opinion.

_____

TO THE CLERK:

Please file the foregoing opinion.

_____
Chief Judge