NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4273
_____

JAMES A. BAKER,
Appellant

v.

UNITED DEFENSE INDUSTRIES, INC.,
d/b/a BAE SYSTEMS LAND & ARMAMENTS, INC.
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
D.C. Civil Action No. 05-cv-2643
(Honorable Yvette Kane)
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
November 1, 2010

Before: SCIRICA, STAPLETON and ROTH, *Circuit Judges*.

(Filed: December 8, 2010)
_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

Plaintiff-Appellant James Baker brought age discrimination and retaliation claims

under federal and state statutes against his former employer, Defendant-Appellee United

Defense Industries, Inc. d/b/a BAE Systems Land & Armaments, Inc. The District Court

granted BAE's motion for summary judgment on each count of Baker's complaint. We will affirm.

I.

Until his termination in 2005, Baker served as a human resources ("HR") manager at BAE's York, Pennsylvania facility. While in BAE's employ, Baker reported to Gary Flannagan, director of HR for BAE's Ground Systems Division. Flannagan, in turn, reported to Elmer Doty, Vice-President and General Manager of that division. BAE evaluates its employees annually on a four-tiered scale ranging from "exceptional" to "needs improvement." Baker received a rating of "outstanding" in 2001 and 2002, but, for the period running from September 1, 2002 through August 31, 2003, Flannagan downgraded Baker to "good." Flannagan cited Baker's failure to timely complete projects and to collaborate effectively with other members of BAE's HR team as the rationales for the reduction in Baker's performance evaluation.

Two incidents in which Baker played a central role led to ethics complaints being filed with BAE and directly contributed to the erosion of Baker's workplace reputation. The first concerned a botched firing at BAE's tank plant in Cairo, Egypt. James Byrnes, the manager in charge of BAE's Egypt operation, decided to eliminate the supervisory position held by expatriate employee Woody Hawkins. Byrnes informed John Tile, his direct superior, and Baker, his HR contact in the United States, that he intended to create a new position which would encompass Hawkins' duties. Although Baker was responsible for advising Tile on issues arising in such termination proceedings, he

2

neglected to vigilantly monitor the process or to compile proper documentation. Specifically, Baker did not take appropriate measures to ensure Byrnes was heeding his advice, and, without fully apprising himself of the situation on the ground, he relayed to his superiors Byrnes' assurances that Hawkins both had been apprised of his performance deficiencies and lacked qualifications for the newly-created position. With Baker having failed to flag potential problems or gaps in the record, Flannagan acceded to Hawkins' termination. After learning of his dismissal by seeing his job posted in a company newsletter, Hawkins submitted an ethics complaint. The ensuing investigation exposed Byrnes' deviations from protocol, and Hawkins was reinstated. As a result, Baker's superiors received reprimands and decreased performance evaluations.[1]

The second incident that precipitated an ethics complaint involved a "reduction in force" in which Thomas Waltimeyer's position with the company was eliminated. Ordinarily, the employee chosen for termination under BAE's reduction-in-force policy and procedure has received the lowest cumulative ranking within his job cluster based on a numerical score derived from performance evaluations over the prior three years. Waltimeyer knew he was not the lowest-ranked employee in his cluster. However, in a meeting held after Waltimeyer had learned his position would be eliminated, Baker led him to believe the decision was based solely on his score. Baker did not inform Waltimeyer that the reduction-in-force policy permitted a lower-ranked employee to

---

[1] Baker did not receive a performance evaluation for the period spanning September 2003 to August 2004 because of the decision to terminate his employment in 2004, but the incident was detailed in the draft evaluation Flannagan prepared for Doty in late 2004.

salvage his position if a compelling business reason — a so-called "business case" — existed for his retention, nor did Baker divulge that such business cases had, in fact, excepted three lower-ranked employees from termination. Although BAE had no policy either mandating or prohibiting such disclosures, Baker claims to have believed providing this information would have unnecessarily sent up a "red flag." Nevertheless, Waltimeyer's ethics complaint sparked an investigation by Dan Sharp, BAE's in-house counsel. Sharp's memorandum concluded Baker had provided Waltimeyer with false or misleading information that could have compromised the reduction-in-force procedure, and Flannagan echoed this sentiment by informing Baker that it had been improper from an HR perspective to give Waltimeyer the impression that he was being terminated solely on account of his numerical score.

Baker's strained working relationship with his colleagues and questions about his professional comportment buttressed the concerns felt by his superiors in the wake of these two incidents. Without identifying Baker as the source of his unease, Doty wrote Flannagan in March 2004 to express "grave doubts" about the support management was receiving from the HR department. In May 2004, Flannagan provided Baker with a memorandum detailing the Hawkins and Waltimeyer incidents and outlining the various issues thought to be plaguing his performance. This interim review called for Baker to formulate a "performance action plan." In his plan, Baker acknowledged the two incidents "clearly demonstrate[d] a series of communication miscues" and pledged to

treat intra-office communication as "an essential function" of his job rather than as a perfunctory chore.

Baker's plan failed to placate his superiors. With Baker's reputation among his peers also waning, Flannagan and Doty apparently concluded Baker could no longer be trusted to provide consistent, reliable advice and that he could no longer function effectively within a workplace environment where his credibility was so impaired.[2] In October 2004, Flannagan informed Baker that Doty wanted him fired and that he could either accept a severance package or have BAE begin to document his actions with the intent of terminating him at some future date.[3] Immediately thereafter, Baker began seeking alternative employment. He informed prospective employers he would be available to begin work on March 1, 2005, personally prepared a set of documents styling his departure as a reduction in force, and began clearing out his personal effects and compiling a list of tasks to be transitioned to other employees in anticipation of a March

---

[2] Concerns occasioned by the Hawkins and Waltimeyer incidents were fortified by negative feedback contained within the responses to an anonymous peer review conducted among management personnel in September 2004. Although Baker objected to use of these statements on hearsay grounds, the District Court properly admitted them for the limited purpose of establishing BAE management's state of mind as to how Baker was viewed by his peers. *See* Fed. R. Evid. 801(c) (defining "hearsay" as an out-of-court statement used to prove the truth of the matter asserted).

[3] BAE contends Flannagan informed Baker that he would be fired at the end of the first quarter of 2005 irrespective of his subsequent performance. Although there is ample evidence in the record to support BAE's contention that the decision to remove Baker from his position was fixed in October 2004, we must resolve all genuine factual disputes in Baker's favor as he attempts to resist an order of summary judgment. *See Jacobs Constructors, Inc. v. NPS Energy Servs.*, 264 F.3d 365, 369 (3d Cir. 2001). As we will explain below, resolution of this dispute does not materially influence the outcome of this matter.

2005 departure. Despite the exchange of several counterproposals, BAE and Baker failed to reach an amicable agreement on a settlement package. In an April 8, 2005 memorandum, Flannagan informed Baker he was being terminated pursuant to their prior understanding that Baker's "last day of work would be no later than March 31, 2005." Baker's duties were largely redistributed to three employees: Sonefelt (54 years old), Barge (57 years old), and Danilowicz (27 years old).

## II.

Baker filed an initial charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 3, 2005, slightly over one month before BAE effected his termination. On May 7, 2005, Baker augmented his filing by adding a charge of unlawful retaliation. The EEOC issued a dismissal notice as to both charges and informed Baker of his right to sue. On December 21, 2005, Baker initiated this action. His amended complaint included claims of discrimination and retaliation under both the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34, and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. §§ 951–63.[4]

The District Court granted BAE's motion for summary judgment on each of Baker's claims. The court held that while Baker could make out a prima facie case of discrimination under the ADEA, he could not adduce sufficient evidence to persuade a reasonable factfinder that BAE's proffered legitimate, nondiscriminatory justifications

---

[4] Because Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts" such as the ADEA, *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996), we will collapse Baker's claims for the sake of our analysis.

for his dismissal were pretextual. As for retaliation, the court found Baker could not demonstrate the requisite causal connection between his EEOC filing and BAE's decision allegedly to advance the date of his termination. We agree with the District Court's conclusions, and we will affirm for the reasons outlined below.[5]

III.

A.

We review a grant of summary judgment *de novo*. *Harvard Secured Creditors Liquidation Trust v. IRS*, 568 F.3d 444, 450 (3d Cir. 2009). Summary judgment is proper when there is "no genuine issue as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed R. Civ. P. 56(c)(2). An alleged factual dispute is "genuine" only if the evidence bearing on the disputed fact would permit a reasonable jury to find for the nonmoving party, and the fact is "material" only insofar as its adjudication "could affect the outcome of the case under the applicable substantive law." *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990). We must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d. Cir. 2007). However, if the evidence favoring the nonmovant is "merely colorable" or "not significantly probative," summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

B.

---

[5] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

Under the burden-shifting framework elucidated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804 (1973), a plaintiff advancing a cause of action under the ADEA must first establish a prima facie case of discrimination. *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir. 1995) (applying burden-shifting scheme to ADEA). Assuming a plaintiff has made out her prima facie case, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiff. *Id.* If the employer comes forward with this neutral explanation, the plaintiff must then prove that the stated reason is pretextual. *Id.*

Here, the District Court found that Baker had set forth a prima facie case of age discrimination and that BAE had proffered legitimate reasons for Baker's termination. It concluded, however, that Baker did not satisfy his burden of demonstrating a reasonable factfinder could consider the ostensibly nondiscriminatory reasons for his discharge mere pretexts for discrimination. Because the issue on appeal is whether Baker failed to raise sufficient doubt as to the believability of BAE's alleged business justifications, our analysis is confined to this terminal stage of the *McDonnell Douglas* analysis.

When the defendant rebuts a plaintiff's prima facie case with evidence of a legitimate, nondiscriminatory reason for its action, the plaintiff may survive a motion for summary judgment by pointing to "evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; *or* (2) believe that an invidious discriminatory reason was more likely than not a

motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (emphasis added).[6] To avoid summary judgment, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.*

Merely questioning the wisdom of an employer's decision is not tantamount to impeaching its legitimacy. For legitimacy to be called into question, the plaintiff must do more than argue the employer was "wrong or mistaken;" rather, he "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* at 765 (citations omitted).

---

[6] Throughout its brief, BAE cites Baker's inability to adduce evidence tending to show that BAE's proffered rationales masked a discriminatory motive. Although Baker's case suffers from a paucity of such evidence, BAE mistakenly believes that this shortage is fatal at the summary judgment phase of the proceeding. Our law on this point holds otherwise. To survive a motion for summary judgment, a plaintiff alleging age discrimination need only (1) put forth a prima facie case; and (2) cast sufficient doubt upon the legitimacy of whatever nondiscriminatory justification for the adverse employment action the defendant has advanced so as to enable a reasonable factfinder to consider the proffered justification a pretext. *See Fuentes*, 32 F.3d at 764. "[I]f the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." *Id.* Therefore, although evidence pointing to some age-inspired animus would certainly bolster Baker's contention that BAE's ostensibly neutral justification should be disbelieved, his wholesale inability to demonstrate BAE was impelled by an invidious discriminatory purpose is not damning at the summary judgment phase.

Rephrased, the plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1109 (3d Cir. 1997).

Although Baker impugns the sufficiency of BAE's purported justifications, he fails to proffer a persuasive argument against their legitimacy. In essence, Baker's primary contentions are (1) he was scapegoated for the company's missteps vis-à-vis Hawkins and Waltimeyer; and (2) Flannagan's October 2004 comments implicitly conceded that BAE did not feel Baker's prior wrongdoings warranted termination. Neither of these positions would prompt a reasonable factfinder to surmise BAE's proffered justifications did not "actually motivate the employment action." *See Fuentes*, 32 F.3d at 764.

First, Baker was the principal liaison between Byrnes and BAE's domestic HR outfit, and he repeatedly failed to substantiate reports emanating from Egypt before relaying them to his superiors. Several BAE employees had their performance ratings downgraded on account of the mishandling of the Hawkins affair, and Baker's share of the blame was commensurate with the perceived dereliction of his heightened responsibilities. And, notwithstanding Baker's argument that he did not contravene any policy in the Waltimeyer imbroglio, his handling of the matter precipitated Waltimeyer filing an ethics complaint and provided cause for concern among his employers. Whether Baker may have absorbed more than his allocable share of the true fault for these incidents is of no moment. The issue is whether Baker has demonstrated BAE's avowed

10

reasons to be so implausible or incoherent as to be "unworthy of credence," and his charge of disproportionate blame fails to impeach the legitimacy of BAE's justifications. *See id.* at 765; *see also Keller,* 130 F.3d at 1109 ("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." (internal quotation omitted)).

Second, even if Flannagan had told Baker in October 2004 that he could either expedite the situation by accepting a severance or have his performance scrutinized from that moment forward with subsequent transgressions theoretically to be marshaled against him at some future date, this alone does not imply that BAE lacked legitimate reasons to terminate Baker's employment. Baker reads BAE's decision temporarily to refrain from effecting his removal as a tacit admission that it lacked the grounds to do so; that is, if BAE authentically based its decision to fire Baker on incidents that transpired in 2003, it would not have had to place Baker's late-2004 performance under a microscope. Once more, this falsely equates sufficiency with legitimacy. While there may be a genuine issue of material fact as to whether Flannagan informed Baker that a decision had already been made to sever his employment or whether Baker was led to believe his job might be salvaged by addressing his perceived weaknesses, Baker has not raised a triable issue as to whether BAE's stated justifications are illegitimate and should be discounted. If, in October 2004, BAE had not yet reconciled itself to terminating Baker without having reached an accord on a severance package, Baker has nevertheless failed to satisfy his burden of demonstrating that a rational factfinder would infer BAE concocted a wholly

11

unrelated rationale for terminating his employment between that date and April 2005. *See Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996) (explaining "a plaintiff will survive summary judgment if s/he can produce sufficient evidence that the employer's proffered nondiscriminatory reason for its employment action was not the true reason").

C.

To establish a prima facie case of illegal retaliation under the ADEA, a plaintiff must demonstrate "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Fogelman v. Mercy Hosp., Inc.* 283 F.3d 561, 567–68 (3d Cir. 2002) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)). The EEOC filing is a protected activity, and Baker was indisputably terminated after this occurrence. Baker stumbles, however, at the third prong of this test. He claims BAE accelerated the date of his termination as retribution for his March 3, 2005 EEOC filing, but the District Court granted BAE's motion for summary judgment based on Baker's inability to adduce sufficient evidence attesting to a causal linkage between the filing and the firing. We agree with the District Court.

Baker's lone argument is that the "temporal proximity" of his filing to his April 8 termination reveals causation. While true that when a relatively brief interval separates an employee's protected conduct from the ensuing adverse employment decision, "such

12

temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn," *Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005), this evidence, standing alone, must be "'unusually suggestive' of retaliatory motive before a causal link will be inferred," *Krouse*, 126 F.3d at 503 (citation omitted). Moreover, an employer's decision to proceed "along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).

The District Court properly concluded temporal proximity is not "'unusually suggestive' of retaliatory motive in this context." The end of 2005's first quarter had long been cited by the parties as a potential watershed in their relationship. Regardless of how Flannagan's October 2004 communication was framed, Baker had begun making arrangements for his impending departure, and he had personally indicated to would-be employers that he would be "available for hire by March 1, 2005." Even taking into account Baker's belief that he would not be fired until a severance package had been agreed upon, the April 8 termination date was not unusually suggestive of a retaliatory impulse. Because Baker cannot point to any evidence aside from temporal proximity, the District Court correctly determined that the record is insufficient to support a finding of causality. *See Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 178 (3d Cir. 1997) (clarifying that "it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis

13

from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.").

## IV.

For the foregoing reasons, we will affirm the judgment of the District Court.

14