Mary LAMB–BOWMAN, Plaintiff,

v.

DELAWARE STATE UNIVERSITY, Dr. William B. DeLauder, individually and in his official capacity as President; John C. Martin, individually and in his official capacity as former Athletic Director; and William Collick, individually and in his official capacity as Athletic Director, Defendants.

No. Civ.A. 98–658–SLR.

United States District Court, D. Delaware.

March 27, 2001.

**554**

Leonard L. Williams, Wilmington, DE, Robert L. Bell, C. Vaughn Adams, Washington, DC, for plaintiff.

Noel E. Primos, Schmittinger & Rodriguez, P.A., Dover, DE, for defendants.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

Plaintiff Mary Lamb–Bowman filed this action on November 24, 1998 against defendants Delaware State University ("DSU"), its President, Dr. William B. De-Lauder ("DeLauder"), its former Athletic Director, John C. Martin ("Martin"), and its current Athletic Director, William Collick ("Collick"). Plaintiff alleges wrongful termination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, ("Title VII"), Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"), 42 U.S.C. § 1983, and Delaware's public policy exception to the employment-at-will doctrine. By a December 10, 1999 order of Senior District Judge Murray M. Schwartz, the court dismissed plaintiff's Title IX, Section 1983 and state law claims as time barred.[1] (D.I.34) Currently before the court is defendants' motion for summary judgment on plaintiff's remaining Title VII claims.

## II. BACKGROUND

Beginning in 1985, DSU employed plaintiff as its Head Women's Basketball Coach through a series of one-year contracts. During certain periods of her employment, plaintiff also served as Women's Volleyball Coach and Senior Women's Administrator in addition to her position as basketball coach. (D.I. 60 at B9–B11, B80) From 1985 to July 1994, defendant Martin was plaintiff's immediate supervisor. Sometime after July 1994 and prior to May 1995, defendant Collick became plaintiff's supervisor. Plaintiff's last day of employment at DSU was August 31, 1995. (D.I.1)

Plaintiff claims that since 1987 she had complained to Martin about disparities between the women's and men's athletic programs at DSU, and as a result of her complaints, she and the entire women's athletic program were discriminated and retaliated against by defendants. (D.I. 57 at A45) Specifically, plaintiff alleges that: 1) the athletic department's secretary would perform work for other coaches before performing work for plaintiff;[2] 2) equipment was not set up and floors were not swept when plaintiff wanted to conduct

---

1. The parties disagree as to whether, as a result of this order, defendants DeLauder, Martin and Collick remain liable in their official capacities. Because the court is granting summary judgment in favor of defendants, this issue is moot.

2. Although secretary Helen Scott was also a female member of the athletic department, plaintiff could not state whether she also suffered discrimination by defendants. (D.I. 57 at A69–A70)

practices in the gymnasium, and plaintiff was not provided keys to the gymnasium and the weight room; 3) plaintiff was not allowed to perform certain functions as the Senior Women's Administrator;[3] and 4) a DSU peer committee that investigated plaintiff's alleged NCAA violations reported false findings.[4]  (D.I. 57 at A33–A36) Plaintiff created a "Comparison Table," a document that described the alleged disparities between the women's basketball program and the men's basketball program at DSU, as support for her claim that she had been discriminated against because of her sex.  (D.I. 57 at A72–A78) Plaintiff also alleges that defendants made a "systematic effort" to fire all coaches of women's sports at DSU, including the male coaches.[5]  (D.I. 57 at A42–A43)

On June 15, 1994, Martin sent defendant DeLauder a letter recommending that plaintiff's next one-year contract be a terminal contract:

> Coach Lamb–Bowman has not had a successful program as indicated in her inability to recruit and retain capable student-athletes who are sound athletically and academically; providing proper leadership in motivating students without undue confrontational situations;

over religious emphasis;  abiding by the spirit of the rules of the University and the NCAA, and providing a successful program in the win-loss category.

> Coach Lamb–Bowman is always ready to challenge the rules, the support provided by the University and any short-comings that have been pointed out to her.  It is my firm belief that she will not change and will continue to challenge the support provided her as the reason for any lack of success of the women's program.

(D.I. 60 at B57)

In a letter dated July 6, 1994, defendant DeLauder informed plaintiff that her contract for the following school year would be a terminal contract.[6]  (D.I. 16 at A–1) Plaintiff signed the terminal contract on July 14, 1994.  (D.I. 16 at A–2)

On September 14, 1994, plaintiff wrote a letter to Martin in which she requested various items that she felt were needed to professionally manage the Women's Basketball Team, including computer and video equipment, and a designated facility to shower and change after home basketball games.  (D.I.18, Ex. 1)

---

3.  Plaintiff claims that she often asked Martin if she could arrange schedules for other sports and assist the other teams, but he refused.  None of these requests was documented.  (D.I. 57 at A36)

4.  Defendants investigated plaintiff's alleged noncompliance with certain NCAA rules regarding length and frequency of practices and scrimmages.  In her deposition, plaintiff claimed that the committee's findings did not coincide with the testimony of the students whom the committee members interviewed. (D.I. 61 at B467–B470)

5.  In her deposition, plaintiff clearly stated her belief that the male coaches of women's sports were also discriminated against because of their association with the women's athletic program.  (D.I. 57 at A71–A72)

6.  The letter stated, in pertinent part:

> On the bases of the recommendations of Dr. Gladys Motley, Vice President for Student Affairs, and Mr. John Martin, Director of Athletics, you will be issued a terminal contract for the 1994–95 fiscal year.  The reasons for this include poor academic performance of student athletes, a poor record of performance against both conference and non-conference opponents, difficulties in student-coach relations, and failure to strictly follow the spirit of NCAA regulations.
>
> If during the course of the next year, you show significant improvements in the areas cited, I may reconsider the terminal contract provision.

(D.I. 16 at A–1)

On March 23, 1995, plaintiff met with DeLauder. (D.I. 18 at PA–2) In a letter dated April 13, 1995, plaintiff informed DeLauder that she was experiencing "much emotional distress" since she learned that Martin "falsified [her] Employee Performance Appraisal."[7] (*Id.*) The letter further stated that plaintiff "was very relieved" when DeLauder stated during their March meeting that he was "not aware that [her] contract was a terminal contract; and that if a decision is made to terminate [plaintiff] from the university, [she would] receive a 90 day notice before such termination." (*Id.*) Plaintiff also expressed her view that more could be done for women's athletics at DSU if the women's athletic program was provided with resources equal to those provided to the men's program. (*Id.*)

On May 2, 1995, plaintiff received a letter from Collick asking her to resign.[8] (D.I. 18 at PA–3) The next day, plaintiff wrote a letter to DeLauder stating that her termination was contrary to the agreement she had with him that she would receive 90 days notice before such termi-

nation. (*Id.*) The letter also stated that she felt that she was being forced to resign because of her opposition to discriminatory treatment of women athletes and coaches at DSU. (*Id.*)

In a letter dated May 31, 1995, DeLauder informed plaintiff that she would not be "reappointed" as Head Women's Basketball Coach.[9] (D.I. 16 at A–3) The letter further stated that plaintiff's duties as Head Women's Basketball Coach would end on June 30, 1995, but her contract would extend through August 31, 1995 to provide her with a transitional period. During that time, she was to serve as a special assistant to the Director of Athletics.[10] (*Id.*) Plaintiff was replaced as Head Women's Basketball Coach by a woman, Jackie DeVane. (D.I. 60 at B8)

In her deposition, plaintiff described her experience of discrimination:

> I was personally discriminated against by Martin, by DeLauder, and by Collick, in that basically they were sexists. They were bigots.

---

7. Plaintiff alleges that Martin's evaluations of her performance declined after she complained to him about the disparities between the athletic programs. She also claims that Martin added the words, "Recommend a terminal contract" to her 1994 evaluation after she signed it. (D.I. 57 at A68)

8. In a letter dated May 4, 1995, Collick wrote to DeLauder:

   The areas of concern [over plaintiff's performance are] as follows: 1) poor academic performance of student-athletes, 2) a poor record of performance against both Conference and Non–Conference opponents, 3) difficulties in student-coach relations, and 4) failure to strictly follow the spirit of NCAA regulations.

   It has come to my attention that there was not significant improvement in her Conference and Non–Conference records, there are currently numerous conflicts with regards to student-coach relations, and two sources at our University ... did share sim-

ilar findings with regard to NCAA violations ... by Coach Lamb–Bowman during the alleged said times.
(D.I. 60 at B58)

9. The letter states, in pertinent part:

   On the bases of the recommendations of Dr. Gladys Motley, Vice President of Student Affairs, and Mr. William Collick, Director of Athletics, I regret to inform you that you will not be reappointed as Head Coach of Women's Basketball. Your duties as Head Coach will end on June 30, 1995.

   This action is taken because you have not made significant improvements in the areas cited in my letter dated July 6, 1994 and it has been determined that you violated NCAA rules at least in two instances.
(D.I. 16 at A–3)

10. This transitional period also functioned as the 90 days notice plaintiff was to receive prior to termination.

They always told me to my face how great a job you are doing, good job, keep it up, way to go. And then they get behind my back or on paper, and they were putting these things together to fire me, all because they were sexists, all because I complained, wanting to make things right within the programs, wanting to make things right within not just my program, but in the women's programs in general.

We wanted all of these things. We wanted, you know, to have people come to our games. We wanted TV coverage. We wanted all of these things that the men were getting. But we didn't get it, just because I complained. I did it myself, and then I was chewed up, regurgitated, and thrown to the dogs.

(D.I. 57 at A27–A28)

When asked how she was personally discriminated against because of her sex, plaintiff stated:

How can you separate the two? The program is me. If I have the job, if I have the girls, if I wasn't at Delaware State, how can you separate them to say what actually happened to me as op-

posed to what happened to them? I am them. They are me.

(D.I. 57 at A35)

On November 22, 1995, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination and retaliation in violation of Title VII.[11] (D.I. 16 at A–4) The EEOC issued plaintiff a right to sue letter on August 26, 1998. (D.I.18, Ex. 5)

On November 24, 1998, plaintiff filed a complaint in this court against DSU and DeLauder, Martin and Collick, individually and in their official capacities, alleging that they discriminated against her based on her sex and in retaliation for protected activity by terminating her employment.[12] Plaintiff also claims that DSU discriminated against women athletes in violation of Title IX by failing to provide adequate or equal funding, facilities, equipment and other forms of support for the women's athletic program as compared to the men's program. (D.I.1)

## III.  STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

**11.**  In an affidavit filed with the EEOC, plaintiff stated that after she complained about the athletic program disparities, Martin retaliated against her by falsely altering her 1993–94 performance evaluation after she had signed it. (D.I.18, Ex. 4) Plaintiff further alleged that in May 1995 she was requested to resign because she had "continued to oppose and protest [defendants'] discriminatory administration of their intercollegiate athletic programs on the basis of the sex of their coaches and the sex of their student athletes." Plaintiff claimed that she was wrongfully removed as Head Women's Basketball Coach on June 30, 1995 and her employment with DSU was wrongfully terminated on August 31, 1995 because of her sex and protected activities in opposing sex-based discrimination by DSU

against her and against women in the athletic department. (*Id.*)

**12.**  Plaintiff specifically contends that Martin, who was responsible for her evaluations through 1994, lowered his evaluations of her after she complained to him in 1993 about the inadequacy of scholarships and other sources of funding provided to the women's basketball program. Martin also allegedly falsified her 1993–94 performance evaluation after she had signed it. Plaintiff further alleges that DSU discriminated against her and other female members of the athletic department in terms of assignments and compensation, and that as a result of her requests for equal funding, defendants retaliated by diverting funds allocated to women's athletics to other programs. (D.I.1)

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocomb Indus.*, 814 F.Supp. 1209, 1215 (D.Del. 1993) (*quoting Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir.1987)).

## IV. DISCUSSION

Claims brought pursuant to Title VII are analyzed under a burden-shifting framework. If plaintiff makes a prima facie showing of discrimination or retaliation, the burden shifts to defendants to establish a legitimate, nondiscriminatory reason for their actions. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If defendants carry this burden, the presumption of discrimination drops from the case, and plaintiff must "cast sufficient doubt" upon defendants' proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir.1996) (en banc). In the case at bar, the court need not engage in an extensive burden shifting analysis because plaintiff has not presented facts sufficient to state a prima facie case on her Title VII claims.

### A. Title VII Discrimination Claim [13]

◼ In order to state a prima facie case of Title VII discrimination, plaintiff must

---

**13.** The anti-discrimination provision of Title VII provides:

It shall be an unlawful employment practice for an employer—(1) to fail or refuse to

hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, be-

show: (1) that she is a member of a protected class; (2) that she suffered some form of adverse employment action; and (3) that this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly situated person not of the protected class is treated differently. *See Boykins v. Lucent Techs., Inc.*, 78 F.Supp.2d 402, 409 (E.D.Pa.2000) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir.1999)).

■ In this case, plaintiff has failed to demonstrate that she suffered discrimination because of her sex. Rather, plaintiff's allegations are centered around alleged funding and resource disparities between the women's and men's athletic programs at DSU. Plaintiff has confused discrimination based on her sex with discrimination based on her association with women's athletics. Central to this conclusion is plaintiff's allegation that male coaches of women's sports at DSU were also treated unfairly. Plaintiff was also replaced as Head Women's Basketball Coach by a woman, further undermining her claim of sex discrimination. Plaintiff does allege adverse employment actions taken specifically against her and not other coaches (she could not perform functions as the Senior Women's Administrator, a peer committee erroneously concluded she committed NCAA violations), but plaintiff has

not demonstrated that defendants' motivations in these instances were based on plaintiff's gender as opposed to retaliation for her complaints about the women's athletic program. Based on the record presented, the court concludes that plaintiff has failed to carry her burden of proving a prima facie case on her sex discrimination claim.[14]

## B. Title VII Retaliation Claim

The anti-retaliation section of Title VII provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

■ To establish a prima facie case of retaliation under Title VII, plaintiff must show: (1) that she engaged in a protected activity; (2) that defendants took adverse employment action against her; and (3) that a causal link exists between the protected activity and the adverse action. *See Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir.1999). In the pres-

---

cause of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

14. The court also rejects plaintiff's argument that addressing and correcting deficiencies in the women's athletic program were part of

the "terms and conditions" of her employment and, therefore, triggered the anti-discrimination provision of Title VII. On the contrary, the statute forbids an employer to discriminate against an individual with respect to "compensation, terms, conditions, or privileges of employment, **because of such individual's ... sex.**" 42 U.S.C. § 2000e–2(a) (emphasis added). Plaintiff was not discriminated against because of her sex. Rather, plaintiff claims that she suffered discrimination based on the sex of her students, which is not prohibited by Title VII.

ent case, defendants contend that plaintiff did not engage in a "protected activity" because she did not oppose "any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a) (emphasis added). In other words, plaintiff did not oppose actions by defendants that allegedly violated Title VII. Rather, plaintiff opposed disparities between the women's and men's athletic programs at DSU—an activity that is protected by Title IX.[15]

The court agrees with this plain reading of the statutory language of Title VII. Moreover, although the Third Circuit has not spoken precisely to this issue, there exists case law to suggest that opposition to an alleged violation of Title IX is insufficient to establish a Title VII retaliation claim. In *Barber v. CSX Distribution Servs.*, 68 F.3d 694 (3d Cir.1995), the Third Circuit determined that an employee's letter to his employer's human resources department was too vague to support a finding that his job was eliminated because he engaged in behavior that was protected under the Age Discrimination in Employment Act ("ADEA"). The court determined that the language of the ADEA means that a person has engaged in "protected conduct" when he "has opposed any practice made unlawful by . . . section [623 of the ADEA]."[16]

Thus, the statute provides that a person has engaged in "protected conduct" when s/he opposed discrimination on the basis of age. It is clear from Barber's letter that he felt that he had been treated unfairly as he stated that "the position was awarded to a less qualified individual." However, that letter does not explicitly or implicitly allege that age was the reason for the alleged unfairness. A general complaint of unfair treatment does not translate into a charge of illegal **age** discrimination.

*Id.* at 701–02 (emphasis in original). The similarity between the statutory language of the ADEA and that of the anti-retaliation provision of Title VII indicates that a Title VII retaliation claim must be premised on opposition to a violation of Title VII. *See also Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 249 (5th Cir. 1997) ("[T]he anti-retaliation provision of titles VII and IX are not identical, and title VII provides no remedy for retaliation against individuals who raise charges of noncompliance with the substantive provisions of title IX. Title VII prohibits retaliation only against individuals who oppose discriminatory employment practices or participate in complaints or investigations of employment practices prohibited by title VII. By its plain language, therefore, title VII does not prohibit retaliation against complainants who challenge the misallocation of resources in violation of title IX, as such complaints are wholly unrelated to the discriminatory employment practices proscribed by title VII.") (emphasis in original).

---

**15.** Title IX provides, in pertinent part:
No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.
20 U.S.C. § 1681(a).

**16.** The ADEA states, in pertinent part:
It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.
29 U.S.C. § 623(d) (emphasis added).

In the case at bar, plaintiff has alleged retaliation by defendants because she complained of disparities between the women's and men's athletic programs, a potential violation of Title IX. Plaintiff has not demonstrated that she suffered retaliation because she complained of discrimination based on her sex. Because plaintiff did not oppose a discriminatory action that is proscribed by the statute, plaintiff has failed to state a claim of retaliation under Title VII.[17]

## V. CONCLUSION

For the reasons stated, defendants' motion for summary judgment is granted. An appropriate order shall issue.

---

**17.** Plaintiff also argues that she sufficiently stated a claim of Title VII retaliation because she protested what she believed to be a discriminatory practice. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir.1996) ("[A] plaintiff need not prove the merits of the underlying [Title VII] discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed.") (quotations omitted). However, courts applying this standard have stated that the "discriminatory practice" must be an employment practice, in accordance with the purpose of Title VII. *See, e.g., Kania v. Archdiocese of Phila.*, 14 F.Supp.2d 730, 736–37 (E.D.Pa.1998) ("It is well-settled that a plaintiff in a retaliatory discharge claim need only prove that, at the time she opposed it, she reasonably believed that the challenged employment practice was unlawful."). *See also Nelson v. Upsala College*, 51 F.3d 383, 388 (3d Cir.1995) ("Our holding is consistent with the language of section 704 [of Title VII] as that section interdicts 'an unlawful employment practice' rather than conduct in general which the ... employee finds objectionable. The words 'employment practice' suggest that the retaliatory conduct must relate to an employment relationship."). Plaintiff opposed what she believed to be discrimination suffered by her female students. Plaintiff has not alleged that any students were discharged from employment, not chosen for employment, or otherwise denied any privilege of employment by DSU. Therefore, plaintiff cannot have held a "reasonable belief" that she protested an unlawful employment practice. Advocacy of students' rights is simply not prohibited by Title VII.