**Susan BAKER, Regina Debevec, and Roseanne Zarebicki Plaintiffs,**

**v.**

**WILMINGTON TRUST COMPANY Defendant.**

**No. CIV.A. 01–819 KAJ.**

United States District Court, D. Delaware.

June 4, 2004.

Mark L. Reardon, Esquire, Elzufon Austin Reardon Tarlov & Mondell, P.A., Wilmington, DE, for Plaintiffs.

Sheldon N. Sandler, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for Defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

## I. INTRODUCTION

Plaintiffs Susan B. Baker ("Baker"), Regina M. DeBevec ("DeBevec"), and Roseanne K. Zarebicki ("Zarebicki") (collectively the "Plaintiffs") brought suit against Wilmington Trust Company ("WTC") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"), 42 U.S.C. §§ 1981 and 1981a, and Delaware law on December 10, 2001. (D.I.1.) Plaintiffs allege that WTC terminated their employment in retaliation for their resistance to what they claim was a suggestion by WTC to treat customers differently based on the customer's race. (*Id.*) Presently before me is a motion by WTC for summary judgment (D.I. 25; the "Motion"). I have jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1367. For the reasons that follow, the Motion will be granted.

## II. BACKGROUND [1]

WTC is Delaware's largest retail bank, and operates a branch system that covers the state. (D.I. 26 at 1.) DeBevec began her employment with WTC as a bank teller on July 17, 1972, and on or about 1978, she was promoted to Head Teller at the Claymont branch. (D.I. 33 at 2) Baker began her employment with WTC as a bank teller on February 5, 1990, and on or about late 1998 or early 1999 she was promoted to Assistant Head Teller at the Claymont branch. (*Id.* at 3.) Zarebicki

---

1. The following rendition of the background information for my decision is cast in the light most favorable to the nonmoving party, Plaintiffs, and does to constitute findings of fact.

began her employment with WTC on September 21, 1965, and she was promoted to Head Teller at the Branmar branch in 1992. (*Id.* at 4.)

In August 1999, DeBevec advised WTC that she was unable to reconcile a shortage of approximately $2,600 in her cash drawer, and William Gula ("Gula"), a WTC security officer, began an investigation of the matter. (D.I. 26 at 1.) During the course of the investigation, Gula determined from DeBevec's work papers that she had deviated from a WTC policy that required commercial[2] customers who wished to cash checks made payable to their businesses to first deposit the checks into their WTC accounts. Such customers could then write a check against the deposit account.[3] (*Id.* at 2.) WTC claims its "policy of requiring commercial customers to deposit checks and to then write a check in order to receive cash back was an essential component of [its] ability to track and report large cash transactions, as required by the federal Bank Secrecy Act ("BSA")." (D.I. 26 at 2.)

Specifically, DeBevec's teller materials showed that she regularly cashed checks totaling over $10,000 for each of the businesses of two Indian–Americans known as "Nick" and "Pepi" Patel (collectively the "Patels"). (*Id.* at 5; D.I. 33 at 2.) The Patels were regular customers of WTC, and the proprietors of several businesses,

including Balaji, Inc. ("Balaji") and Nirali, Inc. ("Nirali"). Both Balaji and Nirali operated liquor stores, and each of those liquor stores offered check-cashing services to its customers. (D.I. 33 at 5.) Those services allowed the liquor store customers to endorse their payroll checks to Balaji or Nirali "in exchange for cash in the amount of the paycheck."[4] (*Id.* at 6.) The Patels "would then present the checks to [WTC] in exchange for cash to replenish the liquor stores' respective cash supplies." (*Id.*)

WTC ultimately determined that five tellers cashed checks for the Patels, in violation of the bank's two-step deposit and check-issuance policy and in violation of the BSA, which requires that a Currency Transaction Report ("CTR") be filed when over $10,000 in cash is paid out on related accounts in a business day. (D.I. 26 at 5–6.) The tellers involved with the Patel transactions included DeBevec, Baker, Zarebicki, Criselda Jones ("Jones"), Baker's predecessor as the back-up head teller at the Claymont branch, and Jeanette Preston ("Preston"), the back-up head teller at the Branmar branch. (*Id.*) WTC claims that "[a]fter interviewing these tellers individually, and in light of the serious nature of the tellers' violations of [WTC] policy and of the BSA, [it] concluded that DeBevec, Baker, and Zarebicki should be terminated."[5] (*Id.* at 8.)

---

2. An individual WTC customer could present a check for payment in cash without having to deposit the check in his account. (D.I. 26 at 2.)

3. WTC's manual stated that "a check payable to a ... company ... may NOT be cashed at any time. They may only be deposited into an account which credits the payee." (D.I. 27 at A2.)

4. WTC claims that the Patels' customers were charged a two percent fee for cashing their checks at the liquor stores. (D.I. 26 at 4.)

5. WTC asserts that an investigation revealed that:
> Plaintiffs had cashed checks for the Patels without requiring a deposit on approximately 550 separate business days over a four-year period. When these transactions were aggregated across branches and for the Patel-related businesses, the transaction exceeded $10,000 per day on 481 days, resulting in 481 unfiled CTRs. As a result, the Plaintiffs paid out to the Patels over 15 million dollars in cash during the four year period from 1996 to 1999 without complying with the BSA or Bank policy.

(D.I. 26 at 10.)

DeBevec's employment was terminated on September 13, 1999, and Zarebicki's and Baker's employment was terminated on September 16, 1999. (*Id.*) According to WTC, Preston was not fired since the amount of her transactions did not reach or exceed the $10,000 limit, and therefore she had not violated the BSA and "had not placed WTC at the same risk as had the other tellers." (D.I. 33 at 8.) WTC claims that Jones was not terminated because she was no longer involved with the Patels' transactions, and to the extent that she violated WTC policy, she did so "unwittingly at the direction of DeBevec." (*Id.*)

The Plaintiffs offer several reasons for their belief that their firing was pretextual. First, Plaintiffs claim that cashing payroll checks endorsed to businesses such as the Patels was the "precise type of transaction [that] had been conducted for years at [WTC] by a number of other customers at [WTC]." (*Id.*) Second, Plaintiffs assert that none of the Plaintiffs were ever reprimanded for failure to follow WTC policies and that each had received positive performance evaluations.[6] (*Id.* at 2–4.) Third, Plaintiffs state that the WTC teller manual speaks to checks made payable to a corporation, *see* supra n. 3, but does not reference the situation where checks are initially payable to an individual who then endorses the check, as occurred with the Patel transactions. (*Id.* at 8.) Fourth, Plaintiffs claim that the training given by WTC with respect to the BSA was inadequate. (*Id.* at 12.) Fifth, Plaintiffs allege that in their final meeting with WTC's Compliance Officer, "the Plaintiffs were admonished that they had been taken by 'con men' ... involved 'shady goings on'

... who were trying to find a weak link ... and that with names like 'Nirali' and 'Balaji' ... 'they should have known better.'" (*Id.* at 15.)

Furthermore, Plaintiffs point out that the Patels were notified as early as October 1, 1999 to "make other banking arrangements." (D.I. 27 at A56.) Plaintiffs allege that this was done long before the completion of Gula's investigation, which did not extend beyond the scope of the Patel transactions, "and even though nobody had any reason to suspect the Patels of any criminal activity or other wrongdoing." (D.I. 33 at 16.) Plaintiffs also note that, on October 20, 1999, WTC bank officials met with the Patels and that WTC's General Counsel indicated that the Patels were not at fault for not following WTC's policy.[7] (*Id.*) Plaintiffs point out that this meeting, however, did not cause WTC to reconsider its decision to terminate the Patels' accounts. (*Id.*)

On December 10, 1999 the Plaintiffs filed a charge of discrimination with the Delaware Department of Labor and the Equal Opportunity Commission alleging discrimination on the basis of age, and retaliation for opposing a discriminatory employment practice. (D.I. 33 at 1.) Thereafter, the Department of Labor and the EEOC issued Plaintiffs a "right to sue letter." (*Id.*) On December 10, 2001, Plaintiffs filed a complaint with this court alleging that Plaintiffs' termination from WTC was "retaliation for [their] resistance to WTC's suggestions to treat customers differently based on the customer's race" (D.I. 1 at ¶ 17, ¶ 24, ¶ 31), and thus violated Title VII and 42 U.S.C. §§ 1981 and 1981a,[8] and breached the covenant of good

---

**6.** In fact, just months prior to DeBevec's termination, she was described by her manager as "one of the best if not the best technical head tellers in the branch system." (D.I. 33 at 3.)

**7.** The General Counsel is represented as stating, "it was the tellers faults for not following policy, not [the Patels]." (D.I. 27 at A66.)

**8.** Although Plaintiffs claim a violation of 42 U.S.C. §§ 1981 and 1981a, their entire argument is premised on Title VII. (*See* D.I. 33.)

faith and fair dealing implied in their employment contracts under Delaware law. (*Id.* at ¶¶ 33–40.) Plaintiffs seek a declaratory judgment, a permanent injunction, damages, attorney's fees and costs. (D.I.1.)

## III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c) (2003). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to:

> do more than simply show that there is some metaphysical doubt as to the material facts … In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' … Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, a mere scintilla of evidence in support of the non-moving party is insuffi-

cient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. DISCUSSION

### A. PLAINTIFFS' TITLE VII CLAIM

■ The anti-retaliation section of Title VII states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees … because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). To establish a prima facie case of discriminatory retaliation under Title VII, a plaintiff must show "(1) that she engaged in a protected activity; (2) that the employer took adverse action against her; and (3) a causal link exists between the protected activity and the employer's adverse action." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir.1997). Whether Plaintiff has established a prima facie case of retaliation is a question of law for the court. *See Id.*

■ In the present case, WTC contends that Plaintiffs did not engage "in a protected activity," and have therefore not satisfied the first element necessary to establish a prima facie case of retaliation because Plaintiffs did not "oppose[ ] any practice made an unlawful employment practice." (D.I. 26 at 16) (quoting 42 U.S.C. § 2000e–3(a)). In other words, WTC asserts that Plaintiffs did not oppose any practice made an unlawful employment practice by Title VII, but that, instead, Plaintiffs are alleging that they were retaliated against for opposing WTC's supposedly discriminatory treatment of certain customers. (*Id.* at 17; *See* D.I. 1 at ¶ 17, ¶ 24, ¶ 31.)

In support of its position that Plaintiffs have not opposed an unlawful employment practice, WTC cites *Lamb–Bowman v. De-*

*laware State Univ.*, 152 F.Supp.2d 553 (D.Del.2001). (D.I. 26 at 17.) In *Lamb–Bowman* the plaintiff, who was the defendant university's head women's basketball coach, complained to the athletic director about the disparity between the men's and women's athletic programs. *Id.* at 554. After the university informed the plaintiff that she wouldn't be reappointed, plaintiff brought claims for sex discrimination and retaliation under Title VII. *Id.* at 557. In granting summary judgment for the defendant, the court found that, while the plaintiff had alleged retaliation by the defendants "because she complained of disparities between the women's and men's athletic programs, a potential violation of Title IX," she did not oppose an unlawful employment practice, and thus had failed to state a claim under Title VII. *Id.* at 561. Similarly, WTC argues that even accepting the Plaintiffs' assertion that WTC wanted them to treat customers unfairly, such improper behavior towards customers is not an unlawful employment practice under Title VII. Thus, Plaintiffs did not oppose an unlawful employment practice and have therefore not satisfied the first element of a prima facie case of retaliation. (D.I. 26 at 17.)

In response, Plaintiffs distinguish *Lamb–Bowman* by saying that the plaintiff in that case opposed violations to Title IX, which were entirely unrelated to employment practices. In the case at bar, Plaintiffs argue that:

each of the Plaintiffs were terminated because they failed, or in essence refused, to adopt management's discriminatory view of Indian customers and because they did not, they lost their jobs. By requiring the Plaintiffs to treat the Patels differently than [C]aucasian American customers engaged in the same transactions, [WTC] was requiring the Plaintiffs to discriminate against the Indian customers as a condition of their own employment, and was therefore engaged in an employment practice motivated by a prohibited bias against those of foreign national origin.

(D.I. 33 at 20.) In support of this claim, Plaintiffs argue that in *Moyo v. Gomez*, 40 F.3d 982 (9th Cir.1994), the plaintiff, a prison employee, alleged that he was discharged because he refused to carry out or otherwise protested his employer's policy of denying showers to black inmates after work shifts. *Id.* at 985. The Ninth Circuit stated that if plaintiff could prove his allegation, "he has stated a retaliation claim based on an unlawful employment practice—i.e., the alleged practice of requiring [plaintiff], as a condition of his employment, to discriminate against black inmates." The Ninth Circuit further stated that under 42 U.S.C. § 2000e–3(a), "requiring an employee to discriminate is itself an unlawful employment practice." *Id.*

Even if I were to adopt the Ninth Circuit's interpretation of 42 U.S.C. § 2000e–3(a) that "requiring an employee to discriminate is itself an unlawful employment practice," the Plaintiffs have not proffered any evidence from which a reasonable fact finder could conclude that WTC did, in fact, require its employees to discriminate against persons of Indian descent. The only evidence that Plaintiffs have submitted are a very limited number of offhand comments allegedly made by WTC personnel.

For example, Plaintiffs allege that "on the occasion of her firing, [Baker] was admonished by an agent and employee of WTC for not maintaining the appropriate level of suspicions with regard to the Patel family because of their being of Indian descent, indicating they were all 'con men.' Also, on a prior occasion her supervisor spoke disparagingly to at least one other head teller about business customers of Indian descent, suggesting that these cus-

tomers were inherently untrustworthy." (D.I. 1 at ¶ 16.)

Plaintiffs allege that when DeBevec was fired, she "was admonished by an agent and employee of WTC for not maintaining the appropriate level of suspicions with regard to the Patel family because of their being of Indian descent. Also, during a prior telephone conversation WTC's compliance officer stated to [DeBevec] that 'those damn Indians are always trying to get something for nothing.'" (D.I. 1 at ¶ 23.)[9]

"On the occasion of [Zarebicki's] firing," Plaintiffs allege that she "was admonished by an agent and employee of WTC for not maintaining the appropriate level of suspicion with regard to the Patel family because of their being of Indian descent and was criticized for 'not being suspicious of the Indians who came in to cash their checks.'" (D.I. 1 at ¶ 30.)

Far from establishing that Plaintiffs were required by WTC to discriminate against the Patels because of the Patels' race or national origin, those alleged remarks do not even establish that WTC actually discriminated against the Patels, or Indians in general. See Faragher v. Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("offhand comments . . . and isolated incidents (unless extremely serious) will not amount to discriminat[ion]"). Moreover, there is no basis for Plaintiffs' conclusory allegation that WTC was biased against the Patels because "[t]he Patels' accounts were the only ones terminated," "even though [WTC] had readily available evidence that other Caucasian American businesses were engaged in the same transactions." (D.I. 33 at 17.) By Plaintiffs' own admissions, the other Caucasian businesses that Plain-

tiffs refer to involved a much lower volume of checks and never came close to presenting the amount in a business day that would have triggered a CTR. (D.I. 27 at A 174–175, 274.)

Because Plaintiffs claims about WTC's alleged bias against the Patels are conclusory and without a sound evidentiary basis, Plaintiffs have failed to show that they were terminated for engaging in a protected activity. Accordingly, Plaintiffs have failed to establish a prima facie case of unlawful retaliation.

## B. PLAINTIFFS' ASSOCIATIONAL DISCRIMINATION CLAIM

■ Under Title VII, it is unlawful to discharge an employee or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). Plaintiffs claim for the first time in the Answering Brief that they were discriminated against under this statute "because of their association with the Patels, who were of a foreign national origin." (D.I. 33 at 21) (citing Gresham v. Waffle House, Inc., 586 F.Supp. 1442 (N.D.Ga.1984)). In Gresham, the plaintiff, a white female, filed a complaint under Title VII, 42 U.S.C. § 2000e–2(a), alleging that she was discharged by her employer because of her interracial marriage to a black man. Id. at 1445. In holding that the claim was actionable under Title VII, the Northern District of Georgia held that the defendant's disapproval of a social relationship between a white woman and black man was as much a result of the plaintiff's race as that of her husband. Id.

---

9. The telephone conversation that Plaintiffs refer to took place in the late 1980's. (D.I. 27 at A125–126.) Since Plaintiffs continued to cash checks for the Patels after this statement was allegedly made and throughout the '80's and '90's, it does not follow that Plaintiffs were required to discriminate against the Patels on the basis of their national origin.

Here, Plaintiffs associational discrimination claim is not well founded because it is based on their acquaintance as bank tellers with the Patels as customers, and the courts have recognized that associational discrimination claims must have as their basis a much more significant relationship. *See Zielonka v. Temple Univ.*, No. Civ. A. 99–5693, 2001 WL 1231746 at *6 (E.D.Pa. Oct. 12, 2001) (holding that plaintiff's "friendly acquaintance" with another professor who was allegedly discriminated against was insufficient for a Title VII claim), *Robinett v. First Nat'l Bank of Wichita*, Civ. A. No. 87–2561–S, 1989 WL 21158 at *2 (D.Kan. Feb. 1, 1989) (holding that "good friendship" of a white plaintiff with a black coworker was insufficient to establish the type of relationship necessary to support a cause of action for associational discrimination).

In fact, in the cases that Plaintiffs rely on, such as *Gresham*, 586 F.Supp. 1442, *Holiday v. Belle's Restaurant*, 409 F.Supp. 904 (W.D.Pa 1976), *Whitney v. Greater New York Corp. of Seventh–Day Adventists*, 401 F.Supp. 1363 (S.D.N.Y.1975), *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888 (11th Cir.1986); *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988 (6th Cir.1999), there was a spousal relationship or other family relationship between the plaintiff and the person of a protected class that gave rise to the associational discrimination claim. No such relationship exists in this case.

In any event, there is absolutely no evidence that WTC discriminated against Plaintiffs on the basis of race. Plaintiffs claims are merely conclusory and such allegations are insufficient to withstand a motion for summary judgment. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## C. PLAINTIFFS' BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM

Under Delaware law, employees are generally deemed "employees at will," meaning that they can be terminated without cause, regardless of the employer's motive. *E.I. DuPont de Nemours v. Pressman*, 679 A.2d 436, 437 (Del.1996). An exception to the at-will presumption has been carved out when there is a breach of the covenant of good faith and fair dealing, but for this exception to apply, a plaintiff must establish that he or she falls into one of four exclusive categories. *Id.* at 441–44. The four categories are: (1) where the termination violated public policy; (2) where the employer misrepresented an important fact and the employee relied on that fact to either accept a new position or remain in a present one; (3) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation earned through the employee's past service; and (4) where the employer falsified or manipulated employment records to create fictitious grounds for termination. *See Reed v. Agilent Techs., Inc.*, 174 F.Supp.2d 176, 191 (D.Del.2001).

Plaintiffs argue that their termination violated the first of the four categories because like the " 'clear and firmly rooted public policy to deter, prevent, and punish sexual harassment in the work place,' " "it is certainly reasonable to conclude the Delaware Courts would find the type of discrimination involved in this case a violation of 'clear and firmly rooted policy' as well." (D.I. 33 at 24) (citing *Schuster v. Derocili*, 775 A.2d 1029, 1037 (Del. 2001)). However, the Plaintiffs cannot bootstrap their conclusory claim about WTC's discrimination toward customers into a public policy claim about discrimination against employees. Plaintiffs were

not terminated on the basis of national origin. Moreover, as previously discussed, Plaintiffs have not established that they were required to discriminate against the Patels on the basis of the Patels' national origin. Thus, the argument that they were terminated for failing to do so is specious.

The unrebutted evidence is that, in violation of Federal law and explicit bank policy, the Plaintiffs paid out millions of dollars, over the course of four years, to customers whose requests for cash were or should have been known to the Plaintiffs to be unlawful. No rational fact finder, based on the evidence of record in this case, could conclude that the Plaintiffs lost their job for the reasons Plaintiffs claim.

## V.  CONCLUSION

For the reasons set forth herein, the Motion (D.I.25) will be granted. An appropriate order will issue.

### *ORDER*

For the reasons set forth in the Memorandum Opinion issued in this case today,

IT IS HEREBY ORDERED that defendant Wilmington Trust Company's motion for summary judgment (D.I.25) is GRANTED.