

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-7-2006

# Curay-Cramer v. Ursuline Academy

Precedential or Non-Precedential: Precedential

Docket No. 04-4628

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Curay-Cramer v. Ursuline Academy" (2006). *2006 Decisions.* Paper 801.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/801

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-4628

MICHELE CURAY-CRAMER,

Appellant

v.

THE URSULINE ACADEMY OF WILMINGTON,
DELAWARE, INC., a Delaware corporation;
MICHAEL A. SALTARELLI;
CATHOLIC DIOCESE OF WILMINGTON, INC.,
a Delaware corporation;
BARBARA C. GRIFFIN; and JERRY BOTTO

On Appeal from the United States District Court
for the District of Delaware
District Court No. 03-cv-01014
District Judge: Honorable Kent A. Jordan

Argued on January 17, 2006

BEFORE: FUENTES, ROTH* and BECKER**,
Circuit Judges

*Effective May 31, 2006, Judge Roth assumed senior status.

** This case was argued before the panel of Judges Fuentes, Roth and Becker. Judge Becker died on May 19, 2006, before the filing of the Opinion. The decision is filed by a quorum of the panel. 28 U.S.C. § 46(d)

(Filed: June 7, 2006)

Thomas S. Neuberger, Esquire **(ARGUED)**
Stephen J. Neuberger, Esquire
The Neuberger Firm, P.A.
Two East Seventh Street, Suite 302
Wilmington, DE   19801

        Counsel for Appellant

Barry M. Willoughby, Esquire **(ARGUED)**
Timothy Jay Houseal, Esquire
Michael P. Stafford, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE  19899-0391

        Counsel for Appellees The Ursuline Academy,
        Griffin and Botto

Anthony R. Picarello, Jr., Esquire **(ARGUED)**
Derek L. Gaubatz, Esquire
Jared N. Leland, Esquire
The Becket Fund for Religious Liberty
1350 Connecticut Avenue, N.W.
Suite 605
Washington, D.C.    20036

Stephen E. Jenkins, Esquire
Ashby & Geddes
222 Delaware Avenue
17th Floor
P. O. Box 1150
Wilmington, DE   19899

        Counsel for Appellees-Defendants Saltarelli
        and Diocese

## OPINION OF THE COURT

**ROTH**, <u>Circuit Judge</u>:

Michele Curay-Cramer, a teacher at the Ursuline Academy, a private, Catholic school, was fired after she signed her name to a pro-choice advertisement in the local newspaper. Curay-Cramer asserts both that signing the advertisement was conduct protected by 42 U.S.C. § 2000e-3(a) and that she was fired for conduct less egregious under Catholic doctrine than conduct of male employees who were treated less harshly. The District Court granted defendants' motions to dismiss under FED. R. CIV. P. 12(b)(6). We will affirm but, in doing so, we do not adopt all of the District Court's reasoning.

## I. Factual Background

Ursuline Academy is a private, non-diocesan Catholic school in Wilmington, Delaware. Students range in grade from pre-kindergarten to high school. Ursuline provides college preparatory education from a Catholic perspective. In June of 2001, Curay-Cramer began teaching four English classes and a Religion class to 7th and 8th graders at Ursuline. Eighteen months later, on the thirtieth anniversary of the Supreme Court's decision in <u>Roe v. Wade</u>, 410 U.S. 113 (1973), she lent her name to an advertisement in support of that decision, signed by some six hundred individuals and organizations. The advertisement, which ran in the *News-Journal*, a newspaper of general circulation in Wilmington, Delaware, stated:

> Thirty years ago today, the U.S. Supreme Court in Roe v. Wade guaranteed a woman's right to make her own reproductive choices. That right is under

3

attack. We, the undersigned individuals and organizations, reaffirm our commitment to protecting that right. We believe that each woman should be able to continue to make her own reproductive choices, guided by her conscience, ethical beliefs, medical advice and personal circumstances. We urge all Delawareans and elected officials at every level to be vigilant in the fight to ensure that women now and in the future have the right to choose.

Following the text were the names of the individuals endorsing it, including Curay-Cramer.

On the day the advertisement appeared, Curay-Cramer was called into the office of Barbara C. Griffin, the President of Ursuline. Griffin informed Curay-Cramer that the school was deeply troubled by her public support of a position inimical to accepted Catholic doctrine and that Griffin was considering terminating Curay-Cramer's employment with the school. In response, Curay-Cramer asserted her right to protest without retribution the school's stance on abortion. She also informed Griffin that she had volunteered for Planned Parenthood and distributed pamphlets that she believed contained important information related to reproductive options.

Curay-Cramer alleges that Griffin then consulted with Bishop Michael Saltarelli, who ratified the school's decision to terminate her.

A few days later, Curay-Cramer was again summoned to Griffin's office. She was informed that Ursuline had decided to terminate her employment but was offering her an opportunity to resign. She was given the weekend to think it over. The following week, Curay-Cramer met with Griffin and the head of Ursuline's Religion Department. Curay-Cramer told them that it was illegal to fire her for opposing the school's illegal employment practices. She also asserted that she had never said or done anything in class that was contrary to Ursuline's pedagogic philosophy. Griffin responded that Curay-Cramer could keep her job if she immediately and publicly recanted her

4

support of the advertisement and stated unequivocally that she was pro-life. Curay-Cramer refused. She was then fired.

## II. Procedural History

After she was fired, Curay-Cramer filed suit against Ursuline, Griffin, Jerry Botto (Ursuline's Director of Communications), Bishop Saltarelli, and the Diocese of Wilmington. Curay-Cramer included six counts in her Complaint: three federal claims and three state-law claims. Of the federal claims, Count One focuses on the advertisement in the *News-Journal* and alleges that it was a violation of Title VII and the Pregnancy Discrimination Act (PDA) to fire Curay-Cramer for opposing Ursuline's illegal employment practice of firing anyone who has or contemplates an abortion.[1] Count Two is based on the advertisement and associated advocacy for, and association with, persons protected by Title VII and the PDA. In Count Three, Curay-Cramer avers that she was fired because she is a woman and that similarly situated male employees have been treated less harshly for substantially similar conduct.

The District Court granted defendants' motions to dismiss under FED. R. CIV. P. 12(b)(6) after concluding that applying Title VII and the PDA would raise serious constitutional questions and that Congress did not manifest a clear legislative intent that Title VII be applied in a case like Curay-Cramer's. See NLRB v. Catholic Bishop of Chi., 440 U.S. 490 (1979). The District Court then dismissed Curay-Cramer's state-law claims under 28 U.S.C. § 1367(c)(3).

## III. Jurisdiction and Standard of Review

The District Court exercised original jurisdiction pursuant to 42 U.S.C. §§ 2000e et seq. (Title VII), as amended by the PDA, 42 U.S.C. § 2000e(k). We have appellate jurisdiction to review the final order of dismissal under 28

---

[1]Curay-Cramer alleges that Ursuline has such a policy and practice; for purposes of reviewing this motion to dismiss, we accept that assertion.

U.S.C. § 1291.

We exercise plenary review of a district court's dismissal under FED. R. CIV. P. 12(b)(6). Alexander v. Whitman, 114 F.3d 1392, 1397 (3d Cir. 1997). We affirm where a party has failed to state a claim upon which relief can be granted. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Although we must accept as true all well-pled allegations, Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994), we need not credit the non-movant's conclusions of law or unreasonable factual inferences. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Finally, we can affirm on any basis appearing in the record. Bernitsky v. United States, 620 F.2d 948, 950 (3d Cir. 1980).

## IV. Discussion

Title VII provides, in relevant part:

It shall be an unlawful employment practice for an employer–

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

The PDA, 42 U.S.C. § 2000e(k), provides:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . ..

This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion.

Id.

Title VII also contains a provision that protects employees from retaliation: "It

shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . .." 42 U.S.C. § 2000e-3(a).[2]

Curay-Cramer contends that Title VII's opposition clause protects any employee who has had an abortion, who contemplates having an abortion, or who supports the rights of women who do so. This Court has not ruled on this issue.[3]

---

[2] It is axiomatic that an employer is free to terminate an employee provided that the employee is not engaged in protected conduct.

[3] We note that the Sixth Circuit Court of Appeals has held that "an employer may not discriminate against a woman employee because 'she has exercised her right to have an abortion.'" Turic v. Holland Hospitality, Inc., 85 F.3d 1211, 1214 (6th Cir. 1996) (quoting H.R. REP. NO. 95-1786 (1978) (Conf. Rep.), reprinted in 1978 U.S.C.C.A.N. 4749, 4765-66).

However, even if we were to assume that properly structured opposition and association activity, directed toward an employer's policy or practice of discriminating against women who have or contemplate abortions, can fall within the ambit of

Title VII, still we conclude that Curay-Cramer has failed to state a claim in Counts One and Two.

## A. Counts One and Two

In considering Counts One and Two, we will not adopt the District Court's determination that applying Title VII and the PDA raises substantial constitutional questions because at a more basic level we have determined that Curay-Cramer fails to state a claim. We conclude that Curay-Cramer did not engage in protected activity when she signed a pro-choice advertisement that did not mention employment, employers, pregnancy discrimination, or even gender discrimination. We will, therefore, affirm the District Court's dismissal of the first two counts of her Complaint but not for the reasons adopted by the District Court.

Title VII's anti-retaliation provisions protect employees who participate in Title VII's statutory processes or who otherwise oppose employment practices made illegal by Title VII. Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259-60 (4th Cir. 1998). Defendants Ursuline, the Diocese, and Bishop Saltarelli argue, however, that basic pro-choice advocacy does not constitute opposition to an illegal employment practice. We agree.

---

Extending that principle, the Sixth Circuit further held that an employer "cannot take adverse employment action against a female employee for merely thinking about what she has a right to do." Id. Likewise, the Equal Employment Opportunity Commission (EEOC) has taken the position that it is an unlawful employment practice to fire a woman "because she is pregnant or has had an abortion." 29 C.F.R. pt. 1604, App. (1986).

First, case law has established that opposition to an illegal employment practice must identify the employer and the practice – if not specifically, at least by context. For example, in Barber v. CSX Distribution Services, 68 F.3d 694, 701-02 (3d Cir. 1995), we held that a letter to an employer's Human Resources Department was not protected activity because it did not specifically complain about age discrimination.[4] The letter, which stated that the plaintiff felt that the position was given to a less qualified person, was too vague to constitute opposition to an unlawful employment practice of his employer because it neither "explicitly or implicitly" alleged that a protected characteristic was the basis for the adverse employment action. Id. at 702. A general complaint of unfair treatment is insufficient to establish protected activity under Title VII. Id.; Dupont-Lauren v. Schneider (USA), Inc., 994 F. Supp. 802, 823 (S.D. Tex. 1998) ("Vagueness as to the nature of the grievance . . . prevents a protest from qualifying as a protected activity.").

Moreover, there is no hard and fast rule as to whether the conduct in a given case is protected. Barber, 68 F.3d at 702. Instead, we evaluate the facts of each case in light of the statutory language and legislative intent. We have previously recognized that protected opposition conduct includes more than formal filing of charges before the EEOC. Id. Indeed, in Barber we cited with approval the Second Circuit's language in Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990), in which the court held that Title VII's opposition clause is triggered by formal EEOC proceedings "as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or

_____

[4]We have previously recognized that Title VII and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. (2000), are comparable in many contexts. As such, we refer to ADEA cases throughout this opinion. See Geary v. Visitation of the Blessed Virgin Mary Parish Sch., 7 F.3d 324, 331 (3d Cir. 1993) (comparing the retaliation provisions of Title VII and the ADEA).

society in general, and expressing support for co-workers who have filed formal charges." (citations omitted). When deciding whether a plaintiff has engaged in opposition conduct, we look to the message being conveyed rather than the means of conveyance. Barber, 68 F.3d at 702.

Our review of the jurisprudence in this area convinces us that Curay-Cramer's conduct in this case is not deserving of protection under the opposition language of Title VII. Despite the wide net cast by Sumner, we are not aware of any court that has found public protests or expressions of belief to be protected conduct absent some perceptible connection to the employer's alleged illegal employment practice. See Dupont-Lauren, 994 F. Supp. at 823 (holding that employee's statement was too vague to constitute protected opposition activity where it did not apprize the employer of any practice viewed as discriminatory or accuse anyone at the employing company of engaging in discrimination). As the Ninth Circuit made clear in EEOC v. Crown Zellerbach Corp., it must be possible to discern from the context of the statement that the employee opposes an unlawful employment practice. 720 F.2d 1008, 1012-13 (9th Cir. 1983) (holding that employee engaged in protected activity by issuing a letter accusing his employer of "racism" and "discrimination").

In this context, public manifestations of disagreement with illegal employment practices can be protected under the opposition clause. For example, an employee's appearance on the news magazine "60 Minutes" was assumed to be protected conduct where the entire show was about allegations of sexual harassment and discrimination within the Bureau of Alcohol, Tobacco and Firearms. Hoffman v. Rubin, 193 F.3d 959, 963 (8th Cir. 1999). Similarly, in Copeland v. Rosen, a district court held that an employee, who attended a public meeting of students and parents organized for the express purpose of challenging the allegedly discriminatory termination of a black teacher, engaged in protected opposition activity. 38 F. Supp. 2d 298, 306-07 (S.D.N.Y. 1999).

A closer case is Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130 (5th Cir. 1981). There, the Fifth

10

Circuit upheld a district court's conclusion that boycotting and picketing activity was protected conduct in the face of a defense assertion that the boycotting was merely directed toward inequality in public accommodation. Id. at 1136-37. However, the record in that case supported the District Court's conclusion that the civil rights organization responsible for the picketing, which occurred directly outside the stores of the employer, was directed at the employer's allegedly discriminatory employment practice of withholding certain jobs from black employees. Id. An owner of the store even conceded that the reason for the boycott was that "[t]hey claimed that uh the merchants in Winnsboro were unfair to uh blacks." Id. at 1137.

The *News-Journal* advertisement stated that the right to abortion was "under attack" and urged "Delawareans and elected officials at every level to be vigilant in the fight to ensure that women now and in the future have the right to choose." This language cannot be construed as opposition to Ursuline's alleged policy and practice of terminating women who have or contemplate abortions. The advertisement did not mention gender discrimination, pregnancy discrimination, or employment practices. It did not mention Ursuline or any other schools or employers. To turn pro-choice advocacy, unconnected to employment practices, into conduct protected by Title VII would inappropriately stretch the concept of protected activity.

As written and under the circumstances in which it appeared, the advertisement simply is not protected opposition activity. Moreover, there is no context from which one could reasonably conclude that Curay-Cramer's signature at the bottom of the advertisement was in response to Ursuline's alleged illegal policy or practice. Instead, context suggests that the advertisement was a public endorsement of the Supreme Court's decision in Roe v. Wade, running, as it did, on the thirtieth anniversary of that decision. Having failed to mention discrimination in any way, let alone employment discrimination, and absent any context from which it is reasonable to conclude that the advertisement was directed at employers generally or at Ursuline specifically, Curay-Cramer did not engage in activity protected by Title VII when she lent her name to the pro-choice

11

position articulated by the advertisement.[5]

Perhaps realizing the tenuous nature of her claim of opposition activity based solely on public pro-choice advocacy, Curay-Cramer attempts to bolster her assertion that she engaged in protected conduct by averring that, once she was called into Griffin's office, she made it clear that it would be wrong to terminate her for opposing practices of her employer that interfere with the legal right to an abortion. But as the Supreme Court has held, an employer need not refrain from carrying out a previously reached employment decision because an employee subsequently claims to be engaging in protected activity. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001). Curay-Cramer's Complaint makes it clear that Griffin contemplated firing her from the moment Griffin read the advertisement. The case law provides that an employee may not insulate herself from termination by covering herself with the cloak of Title VII's opposition protections *after* committing non-protected conduct that was the basis for the decision to terminate. If subsequent conduct could prevent an employer from following up on an earlier decision to terminate, employers would be placed in a judicial straight-jacket not contemplated by

---

[5]Although not directly on point, we believe that Lamb-Bowman v. Delaware State University, 152 F. Supp. 2d 553 (D. Del. 2001), provides a useful comparison. In that case, the District Court held that a female basketball coach did not engage in protected opposition activity by communicating her displeasure with defendant's perceived violation of Title IX, which prohibits schools from providing disparate levels of funding to men's and women's sports programs. Id. at 560. The plaintiff in Lamb-Bowman was asking the court to infer that public protest against unfair treatment toward female student athletes was, by implication, an allegation that the school was involved in unlawful gender discrimination in employment. The factual setting is distinguishable. Nevertheless, it is relevant that the District Court was reticent to find protected activity based on general protests of gender inequality. As with the situation here, public advocacy on issues impacting women does not always evoke the protection of Title VII's opposition clause.

Congress. See id. at 272; Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1232 (11th Cir. 2006); Cichon v. Exelon Generation Co., 401 F.3d 803, 811 (7th Cir. 2005) (applying the Breeden principle in the context of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq.).

Curay-Cramer's subjective state of mind is also irrelevant for purposes of determining whether she engaged in protected conduct. Curay-Cramer claims that by lending her name to the advertisement she communicated four "messages and ideas" to Ursuline: (1) it did not have the right to discriminate against women; (2) it should start a dialog concerning the rights of pregnant women; (3) it should "stop being so certain of the correctness of its position," which interferes with a woman's right to choose; and (4) "[i]t should end policies which interfere with access to or advocacy of abortion." That Curay-Cramer intended to send these messages by signing the advertisement does not change the fact that the advertisement itself, viewed objectively, does not achieve that goal. It is the objective message conveyed, not the subjective intent of the person sending the message, that is determinative.

## B. Count Three

Turning to Count Three, we agree with the District Court's determination that applying the PDA and Title VII raises a substantial constitutional question under the First Amendment's Religion Clauses. Curay-Cramer contends that she was fired because she is a woman and that similarly situated male employees have been treated less harshly for substantially similar conduct. In order to assess this claim of the relative harshness of penalties for "similar conduct," we would have to measure the degree of severity of various violations of Church doctrine.

In determining whether there is a substantial constitutional question, we are guided by the Supreme Court's analytical framework in Catholic Bishop. 440 U.S. at 490. In Catholic Bishop, the Supreme Court was faced with the question whether the National Labor Relations Act should be read to grant the National Labor Relations Board jurisdiction over

13

religious schools. 440 U.S. 490 (1979). In holding that the statute did not confer such jurisdiction, the Court set forth an analytical process to determine whether a statute presents "a significant risk that the First Amendment will be infringed." Id. at 502. First, a court must determine whether applying the statute raises "serious constitutional questions." Id. at 501. Second, if it does, a court must discern whether there is a "clear expression of an affirmative intention" on the part of Congress to have the act apply in the situation presented. Id. at 504. Finally, if such an affirmative intention is shown, the court will determine whether the statute violates the Constitution as applied to the facts presented in the case. Id. at 507. The purpose of this test is to avoid addressing constitutional questions absent clear legislative intent to apply the statute in a way that raises a significant risk of infringing constitutional rights. Geary, 7 F.3d at 324.

Turning to the Catholic Bishop test, first we must determine whether applying Title VII to a religious employer[6]

---

[6]Curay-Cramer argues that Ursuline is not a religious employer because its corporate documents do not say that it is organized for a religious purpose and because it does not make its employees sign "Cardinal's Clauses"–contracts that provide that an employer is organized for a religious purpose and expressly grant the employer the right to terminate an employee that does not follow the tenets of the faith. Whether a school is legally diocesan or independent does not control our inquiry.

> It is the suffusion of religion into the curriculum and the mandate of the faculty to infuse the students with the religious values of a religious creed which create the conflict with the Religion Clauses and not the vesting of legal title or the responsibility of operation.

NLRB v. Bishop Ford Cent. Catholic High Sch., 623 F.2d 818, 823 (2d Cir. 1980). The very allegations of Curay-Cramer's Complaint show that Ursuline is a religious school for purposes of our inquiry. She asserts that it is functionally controlled by

14

under these circumstances raises serious constitutional questions. See, e.g., Rayburn v. Gen. Conference of Seventh-Day Adventists, 772 F.2d 1164, 1166 (4th Cir. 1985) (finding that applying Title VII's prohibitions against gender and racial discrimination to a church that declined to hire a female pastor raised serious constitutional questions). In Catholic Bishop, the Supreme Court noted that the resolution of fair labor practice claims "in many instances will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's mission." 440 U.S. at 502. The "very process of inquiry" can impinge on rights guaranteed by the First Amendment. Id.

We have had occasion to consider the constitutional issues raised by applying Title VII to religious employers in similar contexts. For example, in Little, 929 F.2d 944, 950 (3d Cir. 1991), we concluded that applying Title VII to a claim of religious discrimination by an employee terminated from a Catholic school for marrying in violation of canon law would raise serious constitutional questions.

> [I]nquiry into the employer's religious mission is not only likely, but inevitable, because the specific claim is that the employee's beliefs or practices make her unfit to advance that mission. It is difficult to imagine an area of the employment relationship *less* fit for scrutiny by the secular courts. Even if the employer ultimately prevails, the process of review itself might be excessive entanglement.

Id. at 949. While it is true that the plaintiff in Little styled her allegation as one of religious discrimination whereas Curay-Cramer's third Count alleges gender discrimination, we do not

---

the Diocese and Bishop Saltarelli, that it would be devastated financially if the Diocese withdrew its support, and, most importantly, that its teachers understand that they are always to indoctrinate Ursuline's students with the views of the Catholic Church.

15

believe the difference is significant in terms of whether serious constitutional questions are raised by applying Title VII. Comparing Curay-Cramer to other Ursuline employees who have committed "offenses" against Catholic doctrine would require us to engage in just the type of analysis specifically foreclosed by Little.

In Geary, decided just two years after Little, we held that applying the ADEA to a religious school did not present a significant risk of violating the First Amendment because a court would only conduct a "limited inquiry" into whether the school discriminated against the plaintiff on the basis of age or whether the proffered non-discriminatory reason for firing the plaintiff, in that case marrying in violation of canon law, was the actual reason or a pretext. 7 F.3d at 328-29. We noted that as long as the plaintiff did not challenge the validity or plausibility of the religious doctrine said to support her dismissal, but only questioned whether it was the actual motivation, excessive entanglement questions were not raised. Id. at 330.; DeMarco v. Holy Cross High Sch., 4 F.3d 166, 170-71 (2d Cir. 1993). Thus, with Geary in mind, we note that many claims of discrimination against a religious employer under Title VII will not raise serious constitutional questions.

Here, however, with the allegation that male employees, who committed substantially similar offenses, were treated differently than was Curay-Cramer, we would have to assess the relative severity of offenses. This exercise would violate the First Amendment. See Hall v. Baptist Catholic Archdiocese of Indianapolis, 215 F.3d 618, 626-27 (6th Cir. 2000) ("If a particular religious community wishes to differentiate between the severity of violating two tenets of its faith, it is not the province of the federal courts to say that such differentiation is discriminatory and therefore warrants Title VII liability.") (quoting Hall v. Baptist Mem'l Health Care Corp., 27 F. Supp. 2d 1029, 1039-40 (W.D. Tenn. 1998) (citing Lynch v. Donnelly, 465 U.S. 668, 672 (1984)) (stating that the Religion Clauses were designed "to prevent, as far as possible, the intrusion of either [the church or the state] into the precincts of the other."). In this case, Curay-Cramer alleges that similarly situated male employees were treated differently, but points only to men who

16

are Jewish or oppose the war in Iraq.[7]

As the District Court noted, absent an allegation that a male employee publicly attacked the Church's position on abortion, evaluating the comparators

> would require an analysis of Catholic doctrine to determine whether the decision to employ a teacher of a different religious background constitutes an affront to the Catholic faith and, if so, whether it is an affront of at least the same seriousness as the Plaintiff's repudiation of

Catholic doctrine on when life begins and the responsibility to preserve life *in utero*.

Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 344 F. Supp. 2d 923, 934 (D. Del. 2004).

We conclude that if we were to consider whether being Jewish or opposing the war in Iraq is as serious a challenge to Church doctrine as is promoting a woman's right to abortion, we would infringe upon the First Amendment Religion clauses. See

---

[7]At oral argument counsel for plaintiff conceded that he was not aware of any male employees at Ursuline who engaged in public pro-choice advocacy. Under FED. R. CIV. P. 11, a party must have a reasonable basis to believe that a factual assertion has evidentiary support. To support her claim that similarly situated males were treated differently by Ursuline, Curay-Cramer cites examples that, while perhaps meeting the statutory requirements for similarity, are not sufficiently similar to avoid evaluating the relative severity of violations of Church doctrine. Because Curay-Cramer had an obligation to support her factual assertion, we must assume that the omission of an allegation involving a male employee who was terminated for public pro-choice advocacy is an admission that no such male exists.

17

Hall, 215 F.3d at 626-27.[8] Thus, having reached the conclusion that it would raise serious constitutional questions to apply Title VII to this case, we turn to the second prong of Catholic Bishop: whether Congress has manifested an intent to have Title VII apply to teachers in religious schools in this context. 440 U.S. at 504.

We note that the courts that have addressed this issue have held that, under most circumstances, Title VII's substantive provisions, with the exception of the prohibition against religious discrimination, apply to religious employers. Little, 929 F.2d at 947-48. Nevertheless, we do not assume that Title VII applies in all contexts and under all fact scenarios.

The legislative history of Title VII shows that Congress intended to exclude religious employers from the provisions prohibiting religious discrimination. The original verison of the 1964 Civil Rights Act, H.R. 7152, excluded religious employers from all of Title VII. H.R. REP. NO. 88-914 (1963) reprinted in EEOC Legislative History of Title VII and XI of Civil Rights Act of 1964 at 2010 (1968) ("1964 Legis. Hist."); 1964 U.S.C.C.A.N. 2355. This exemption was redrafted to apply the bulk of Title VII's provisions to religious employers but still permitted them to employ individuals of a particular religion. 1964 Legis. Hist. at 3001, 3004, 3050. This version passed both the House and Senate. EEOC v. Pac. Press Publ'g Ass'n, 676 F.2d 1272, 1276-77 (9th Cir. 1982). In 1972, the issue of exemptions for religious employers arose again. The result was the expansion of the exemption to provide that it would not be

---

[8]Curay-Cramer also alleges "alternative" bases to support Count Three. Two of these follow her allegations in Counts One and Two. As a third alternative basis, she alleges that she was a qualified Religion teacher who was replaced by a male. Leaving aside that she admits she was an English teacher who taught a single Religion class and does not aver that she was replaced by a male *English* teacher, we note that discrimination challenges to a religious school's selection of full-time religion teachers are fraught with constitutional pitfalls. Little, 929 F.2d at 949.

18

an unlawful employment practice for a religious school to hire employees based on their religious beliefs.  Id. at 1277.

The exemption now provides:

> Notwithstanding any other provision of this subchapter, . . . it shall not be an unlawful employment practice for a school . . . to hire and employ employees of a particular religion if such school . . . is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution is directed toward the propagation of a particular religion.

42 U.S.C. § 2000e-2(e)(2).

Nevertheless, there are circumstances in which Congress' intention to apply Title VII to religious employers is less clear. These cases tend to involve the interplay of Title VII's exemption for religious employers and the application of Title VII's remaining substantive provisions.  The conflict is presented because the text and legislative history of § 2000e-2(e)(2) show that "Congress intended the explicit exemptions of Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organizations religious activities."  Little, 929 F.2d at 951.

In this context, there are circumstances, like those presented here, where a religious institution's ability to "create and maintain communities composed solely of individuals faithful to their doctrinal practices" will be jeopardized by a plaintiff's claim of gender discrimination.  Id.; EEOC v. Miss.

19

College, 626 F.2d 477, 485 (5th Cir. 1980) (holding that a plaintiff is barred from proceeding with a Title VII suit if a religious employer presents "convincing evidence" that the employment practice was based on a religious preference).

We distinguish this case from one in which a plaintiff avers that truly comparable employees were treated differently following substantially similar conduct. In such a case, neither the concerns of Little nor the interests of the exemption for religious employers from religious discrimination claims are raised. Requiring a religious employer to explain why it has treated two employees who have committed essentially the same offense differently poses no threat to the employer's ability to create and maintain communities of the faithful. See DeMarco, 4 F.3d at 171 (providing that permissible pretext cases can involve the question "whether the rule applied to the plaintiff has been applied uniformly . . ..").

Were we, however, to require Ursuline to treat Jewish males or males who oppose the war in Iraq the same as a Catholic female who publicly advocates pro-choice positions, we would be meddling in matters related to a religious organization's ability to define the parameters of what constitutes orthodoxy. See Little, 929 F.2d at 948 (expressing concern that applying Title VII to a religious employer's decision to terminate an employee who remarried in violation of canon law would force the court "to determine what constitutes 'the official teachings, doctrine or laws of the Roman Catholic Church' and whether plaintiff has 'rejected' them."); Hall, 215 F.3d at 626-27. Even assuming such a result is not expressly barred by 42 U.S.C. § 2000e-2(e)(2), the existence of that provision and our interpretation of its scope prevent us from finding a clear expression of an affirmative intention on the part of Congress to have Title VII apply when its application would involve the court in evaluating violations of Church doctrine. Thus, we will not apply Title VII to Curay-Cramer's claim because Congress has not demonstrated a clear expression of an affirmative intention that we do so in situations where it is impossible to avoid inquiry into a religious employer's religious

20

mission or the plausibility of its religious justification for an employment decision. Little, 929 F.2d at 949; Geary, 7 F.3d at 330.

We caution religious employers against over-reading the impact of our holding. It is by no means the case that all claims of gender discrimination against religious employers are impermissible. Indeed, as we have discussed above, many such claims may not raise serious constitutional questions. If a religious employer does not offer a religious justification for an adverse employment action against a non-ministerial employee, it is unlikely that serious constitutional questions will be raised by applying Title VII. See Lukaszewski v. Nazareth Hosp., 764 F. Supp. 57, 60 (E.D. Pa. 1991) (finding that a plaintiff's ADEA claim did not raise serious constitutional questions in part because the religious employer's nondiscriminatory reason for terminating the employee (using racial epithets), was a legitimate, nondiscriminatory reason for a secular employer to fire an employee); Weissman, 38 F.3d at 1045 (noting, in declining to find serious constitutional questions by applying the ADEA in that case, that "the Temple failed to allege deficiencies in [] arguably religious duties or to assert any other religious reasons for [the plaintiff's] termination.").

Finally, we do not hold that a plaintiff seeking to establish pretext by a religious employer need establish that the comparators engaged in precisely the same conduct as that said to support the adverse employment action against the plaintiff. Whether the proffered comparable conduct is sufficiently similar to avoid raising substantial constitutional questions must be judged on a case-by-case basis. Suffice it to say that under the circumstances presented here, resolving this case would require the District Court to compare the relative severity of violations of religious doctrine. Congress has not manifested an affirmative intention to apply the statute to a religious employer in the face of such constitutional difficulties. Curay-Cramer, thus, does not present in Count Three a viable claim under Title VII.

21

## V. Conclusion

We conclude that Curay-Cramer has failed to state a claim upon which relief can be granted with respect to the first two counts of her Complaint because signing the pro-choice advertisement was not protected conduct under Title VII's opposition clause. Curay-Cramer's third count fails because Congress has not clearly expressed an affirmative intention to apply Title VII to a claim, as asserted here, against a religious employer in the present context. Therefore, we will affirm the judgment of the District Court dismissing the first three counts of Curay-Cramer's Complaint under FED. R. CIV. P. 12(b)(6) and dismissing without prejudice her state law claims.